**WATERMAN–BIC PEN CORPORATION,**
**Plaintiff,**

v.

**W. A. SHEAFFER PEN COMPANY, DIVISION OF TEXTRON, INC.,**
**Defendant.**

**Civ. A. No. 2273.**

United States District Court
D. Delaware.

April 20, 1967.

Arthur G. Connolly, Thomas S. Lodge, of Connolly, Bove & Lodge, Wilmington, Del., Thomas F. Reddy, Jr., James G. Foley and David J. Toomey, of Pennie, Edmonds, Morton, Taylor & Adams, New York City, of counsel, for plaintiff.

William S. Potter, of Berl, Potter & Anderson, Wilmington, Del., Fred T. Williams, Theodore W. Anderson, Jr., and Thomas E. Smith, of Pendleton, Neuman, Seibold & Williams, Chicago, Ill., of counsel, for defendant.

## OPINION

CALEB M. WRIGHT, Chief Judge.

This is an action for infringement of a patent and jurisdiction is based upon the Patent Laws of the United States, Title 35 U.S.C., 28 U.S.C. § 1338 (1948). Suit was originally brought by the Waterman-Bic Pen Corporation against the W. A. Sheaffer Pen Company, a Delaware corporation (Pretrial Order, para. (C) 1). On March 1, 1966 the Sheaffer

Pen Company was merged into Textron, Incorporated, and thereafter Textron was substituted as a party defendant.

On August 13, 1957, United States Letters Patent No. 2,802,448 (DX–3; PX–100) was issued to Waterman Pen Company, Inc., upon an application filed on December 16, 1954 by Donald H. Young, Waterman's Chief Engineer for Research and Development (Pretrial Order, Section (C), para. 3). The plaintiff, Waterman-Bic Pen Corporation, subsequent to the issuance of the patent, acquired the patent and is the owner of the entire right, title and interest thereto including the right to maintain actions for present and past infringement (Complaint, paras. 5 and 6; PX–101, 102, 102A). Hereafter the plaintiff will be referred to as "Waterman", the defendant as "Sheaffer".

## DISCUSSION

The patent in suit relates to a "cartridge type fountain pen". As the prior art discussed below indicates, the concept of this type of pen was not novel. Several conceptions had been formulated, and some patented, but none ever became commercially successful. Their failure related to the unattainability of an ink resistant seal between the feeding element and the ink cartridge.

Young's efforts, which commenced in April of 1952, culminated in a drawing of December 9, 1953 which incorporates all the elements of the product claimed in the patent. Young's work during this period can be traced through a series of sketches, but none of these sketches completely embodies the claims of the patent. For reasons which will become apparent later, Waterman has sought to extend Young's date of invention behind the December 16, 1954 application date. This effort is made in order to overcome certain prior art references cited by Sheaffer. The Court finds that Young's conception date does antedate his application date, but cannot be carried any further back than December 9, 1953. The date of invention cannot be predicated upon the unsubstantiated testimony of the patentee; there must be objective manifestations of invention for the date to be carried behind the date of his constructive reduction to practice. These objective manifestations may take the form of disclosure to third parties, drawings or renderings. Clark Thread Co. v. Willimantic Linen Co., 140 U.S. 481, 489, 11 S.Ct. 846, 35 L.Ed. 521 (1891). Waterman has produced a December 9, 1953 drawing which incorporates all the elements of the patent, but the other earlier drawings offered are incomplete, and cannot serve to give Young an earlier date of invention.

The Young patent (see Appendix for diagram and text), teaches a cartridge type fountain pen. The ink is supplied by disposable polyethylene cartridges. At the forward end of these cartridges is a bore. The outward end of the bore is open; the inner end of the bore is sealed by a thin diaphragm. The feed section of the pen, that portion which contains the writing tip, incorporates a pierce tube which is a hollow, open-ended metal tube whose function is to pierce the diaphragm in the cartridge and transport the ink to the writing point. The rearmost end of the pierce tube is cut on a bias. The tube's outer edge has been inwardly beveled to provide a sharp internal cutting edge. The axial length of the cartridge bore exceeds the length of the bias cut portion of the pierce tube, and the inside diameter of the bore is smaller than the outside diameter of the pierce tube. Thus, the pierce tube is a snug fit in the cartridge bore, and the bias cut portion of the tube is sealed within the bore before the diaphragm is perforated. See figure 2 of Appendix. The inward beveling of the pierce tube assures that the hole cut in the diaphragm will be smaller than the outside diameter of the pierce tube, thus assuring a second pressure seal at the juncture between the pierce tube and the ink supply. The inward beveling also guards against scoring the walls of the bore during the piercing operation. The patent also teaches a "supplemental seal" formed by the telescoping together of the

convex end of the cartridge and the concave seat on the feed section. See figure 2 of Appendix. This meshing of convex and concave configurations forms a supplemental seal in case the ink should escape the seal between the pierce tube and the inside walls of the bore.

The essential element of the Young patent is its teaching of the principle of sealing before piercing; i. e., to avoid leakage, the pierce tube's bias cut portion should be sealingly imbedded in the material of the cartridge before the diaphragm is cut releasing the ink supply. This is the crucial element of a viable cartridge pen taught by the Young patent and not found in the prior art.

A pen embodying all of the teachings of the Young patent was finally placed on the market in September of 1954. Sheaffer cites as prior art several patents, among which is one to Torchi issued November 29, 1960. Sheaffer's citation of the Torchi patent, whose application is dated July 27, 1954, presents an interesting problem. The Torchi patent teaches the same invention as that disclosed in an Italian application by Torchi filed August 26, 1953. Hence, although the Young date of conception is prior to the date of Torchi's United States application, it is subsequent to the date of Torchi's Italian application. Sheaffer contends that Torchi should be a prior art reference as of its foreign filing date, because of 35 U.S.C. § 119 (1952) which provides, in pertinent part, that an application filed in this country within one year of its filing in a foreign country "shall have the same effect" as if the application had been filed in this country on the foreign filing date.[1]

A literal reading of § 119 coupled with the premise that all sections of the Patent Act should be read in pari materia would seem to compel the conclusion that under § 102(e) the Torchi patent is prior art as of its foreign filing date. However, the courts and commentators have not been unanimous in their interpretation of these two sections of the Patent Act.[2] The District Court for the District of Columbia has recently concluded that patents may be used as references as of their foreign filing dates, provided the other requirements of § 119 are complied with. Eli Lilly & Co. v. Brenner, D.C., 248 F.Supp. 402 (1965). And, even more recently, the Court of Customs and Patent Appeals has held that patents may be cited as prior art only as of their domestic filing date. Application of Hilmer, 359 F.2d 859, (1966). The problem is further complicated by the fact that in 1964 the Commissioner of Patents revoked a long-standing section of the Manual of Patent Procedure, § 715.01, which had stated that the prospective patentee need not overcome the foreign filing date of a prior art reference, but need only antedate the reference's United States filing

---

1. Section 119 provides:
 "An application for patent for an invention filed in this country by any person who has, or whose legal representatives or assigns have, previously regularly filed an application for a patent for the same invention in a foreign country which affords similar privileges in the case of applications filed in the United States or to citizens of the United States, shall have the same effect as the same application would have if filed in this country on the date on which the application for patent for the same invention was first filed in such foreign country, if the application in this country is filed within twelve months from the earliest date on which such foreign application was filed; but no patent shall be granted on any ap-

plication for patent for an invention which had been patented or described in a printed publication in any country more than one year before the date of the actual filing of the application in this country, or which had been in public use or on sale in this country more than one year prior to such filing."
 Section 102(e) provides:
 "A person shall be entitled to a patent unless—
 "(e) the invention was described in a patent granted on an application for patent by another filed in tne United States before the invention thereof by the applicant for patent,"

2. For a comprehensive review of the authorities see Application of Hilmer, 359 F.2d 859 (C.C.P.A.1966).

date. In October of 1965 the Manual was amended to make references effective as of their foreign filing dates, provided the other requirements of § 119 were met.

Although the issue is not free from doubt, this Court feels that the position taken in *Hilmer* by Judge Rich represents the more correct view of the relationship between § 119 and § 102(e).

The original purpose of § 119's predecessor was to implement certain provisions of the 1883 Convention of Paris for the Protection of Industrial Property. Section 119 was designed to provide for a right of priority for United States citizens in foreign countries by extending reciprocal privileges to foreign nationals in the United States. The legislative history of § 119 emphasizes the benefits to United States citizens. "Report of the Commissioners Appointed to Revise the Laws Relating to Patents, Trademarks, and Trade Names, with Reference to Existing Conventions and Treaties" 14–15 (1902). Thus, from the legislative history of § 119 it becomes apparent that the section was intended as a patent protecting and not a patent defeating section. The section was intended as an addendum to the United States Patent Act for the limited purpose of increasing the scope of patent protection available to United States citizens. As such, § 119 should be read merely to effectuate the reciprocity envisaged by its framers by giving a United States application the benefit of its foreign filing date for priority purposes alone.

This reading of § 119 is strengthened by the legislative history of 60 Stat. 940 (1946) which was an Act of Congress to extend the normal one year period of priority under § 119 because of the exigencies of World War II. House Report No. 1498 (1946) states at page 3:

"In this connection, it may be observed that the portion of the statute which provides that the filing of a foreign application—

shall have the same force and effect as the same application would have if filed in this country on the date on which the application for patent for the same invention, discovery, or design was first filed in such foreign country—

is intended to mean 'shall have the same force and effect,' etc., insofar as applicant's right to a patent is concerned. This statutory provision has no bearing upon the right of another party to a patent except in the case of an interference where the two parties are claiming the same patentable invention."

The principal error in *Lilly* and other suggestions that a United States patent should be effective prior art as of its foreign filing date is the assumption that an integration of the United States and foreign patent systems is desirable, or mandatory under § 119. Countries which are party to the Convention for the Protection of Industrial Property have not chosen to integrate their national patent systems. Instead, they have chosen to afford each other limited privileges to effectuate their own national policies. The policy of the United States Patent System is to encourage invention. The incentive provided by the patent system is a monopolistic rate of return on his invention to the patentee. The purpose of § 119 is to augment that incentive by facilitating a United States patentee's extension of his monopoly to a foreign country. The foreign applicant for a United States patent should be given only that amount of reciprocity needed to assure the United States patentee of the benefits of the Convention. To give § 119 a more expansive scope would be to ignore its legislative history.

That the Congress, by enacting § 119, did not mean to merge the patent systems of foreign countries into the United States system, and that Congress intended to give foreign patentees only that protection necessary to secure favorable treatment for United States patentees in foreign countries, can be seen by an examination of 35 U.S.C. § 104 (1952). Section 104 provides that

foreign patentees are not to be permitted to prove a date of invention which antedates their foreign filing date. Section 104 countermands the literal language of § 119 which provides that a United States application by a person who has previously filed an application for the same invention in a foreign country "shall have the same effect" as if it had been filed in the United States on its foreign filing date. Section 104 does not permit such an application to "have the same effect" as a regular United States application, because the foreign patentee is not permitted to show a conception date in advance of his constructive reduction to practice. Obviously Congress did not intend to admit the foreign patentee to the full scope of privileges accorded United States applicants. The Court agrees with Judge Rich that § 104 and §§ 102(a) and 102 (g) bespeak a congressional intent that actions and disclosures and knowledge in foreign countries not be accorded relevance when examining United States applications.

Finally, the position taken by the court in *Lilly* might have unfortunate ramifications. *Lilly* assumes that reading § 102(e) and § 119 in pari materia will do no more than accord the foreign patentee's invention "the same effect" as if he had applied in the United States on his foreign filing date. The position taken in *Lilly* would do more. Under the recent case of Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the statutory requirement of nonobviousness is to be ascertained with reference to the prior art. The scope of the prior art, and the difference between the prior art and the invention being scrutinized are to be ascertained. Then the determination is made whether the jump from the prior art to the proffered invention was obvious in the light of the knowledge available to an artisan in the field. The *Lilly* court's position, which expands the available prior art by the addition of United States patents as of their foreign filing dates, would necessarily heighten the level of invention necessary to secure a patent. This may be a desirable result, but it should be accomplished by means of legislation, and not by judicial interpretation of § 119.

█ In any case, a careful perusal of the Torchi patent does not demonstrate an effective prior art reference. The Torchi patent teaches a cartridge with a forwardly opening bore, sealed at its inner end by a diaphragm. The feed section incorporates a pierce tube which is cut on a bias. However, there is no teaching that the pierce tube should be inwardly beveled, nor is there any teaching that the depth of the bore is such that the pierce tube's bias cut portion will be sealed before the diaphragm is pierced. Accordingly, even were the Torchi patent an effective reference as of its foreign filing date, this Court would be unable to conclude that it anticipated the Young patent.

█ The prior art patents as a whole are not anticipatory. Those introduced before this Court which were not in evidence before the Patent Office are merely cumulative. None of the patents cited teaches the vital principle of sealing before piercing, which this Court has already held to be the heart of the Young invention. This failure of the defendant to cite any art more pertinent to this Court than that the Patent Office had before it when passing on the Young invention strengthens the initial presumption of validity with which every patent is clothed. Hazeltine Research, Inc. v. Admiral Corp., 87 F.Supp. 72, 78 (N.D. Ill.1949), aff'd, 183 F.2d 953 (7th Cir. 1950), cert. denied 340 U.S. 896, 71 S.Ct. 239, 95 L.Ed. 650 (1950). All the patents cited to the Court lack the teaching of sealing before piercing, and, with the exception of Del Piero, which was manufactured in Europe, none of them disclose commercially successful items of manufacture—most of them leak.

"The fact that the defendants were unable to come up with any prior art

856

more pertinent than [mere paper patents] strengthens the presumption of the validity of the patent in suit. '[P]atents for useful inventions ought not be invalidated and held for naught because of such excursions into the boneyard of failures and abandoned experiments.'" Power Curbers, Inc. v. E. D. Etnyre & Co., 298 F.2d 484, 493 (4th Cir. 1962).

 Sheaffer has raised the specter of fraud on the Patent Office, charging that Young filed a fraudulent affidavit representing that he had tested prior art pen *samples* when, in fact, he had examined no more than one such *sample*. The Court finds the assertion that Young investigated only one sample not to be borne out by the evidence. The Court has further concluded that the representation that Young had examined *samples*, if, in fact, he had only examined one sample did not impel the Patent Office to issue the patent. A person attacking the validity of a patent for alleged fraudulent representations must prove that the representations were material—that the patent would not have issued but for the representations. Corning Glass Works v. Anchor Hocking Glass Corp., 253 F.Supp. 461, 469–471 (D. Del.1966), rev'd on other gr'ds, 374 F.2d 473 (3d Cir. 1967).

 Having examined the prior art, and having found none cited which anticipates the teachings of the Young patent, and having found that Young's contribution was not obvious, and that his possible misstatement to the Patent Office was not material, the Court concludes that the Young patent is good and valid.

Sheaffer's efforts with the cartridge pen commenced in earnest in July 1954 when Lynn Martin, Chief Development Engineer and Adviser-Consultant, was assigned to the cartridge pen project. Martin was shown the Duo-Cart pen (Torchi patent), and his preliminary sketches for Sheaffer reveal a striking adherence to the Duo-Cart configuration. But Martin's efforts made no tangible contribution to the development of a Sheaffer cartridge pen.

Sometime in September the Waterman cartridge pen, which was now being marketed, was brought to Sheaffer's attention. On September 27th the Waterman pen was discussed at a Sheaffer Executive Committee meeting. Subsequently, Sheaffer personnel examined the Waterman pen carefully, along with other conceptions. The initial Sheaffer Development Department sketches strongly reflect the influence of the Waterman specimens. Waterman's cartridge bore, bias cut, and inwardly beveled pierce tubes were incorporated in the Sheaffer drawings.

The original Sheaffer Development Department drawings were submitted to Sheaffer's Screw Machine and Metal Fabrication Departments and to the Advance Stamping Company for possible production. The Screw Machine Department replied that production would be difficult and would require a great deal of special equipment; the "main trouble" foreseen was the beveled edge. The Metal Fabrication Department advised that it would have difficulty because the cut-off angle would require new equipment and because the 15° angle cut would require a precision grinding job for which it had no equipment. Despite these unencouraging responses, which highlighted the problems posed by the inward bevel, Sheaffer was reluctant to discard the bevel completely. As an alternative Sheaffer accepted a revision proposed by the Advance Stamping Company. Advance Stamping suggested instead of the "beveled" configuration that the pierce tube have an "elongated radiused" configuration at the leading edge. The radiused configuration would not require sweeping changes in Advance's eyelet machines; only a few added dies would be required. The Development Department drawings were revised to show a radiused instead of an angled configuration at the end of the pierce tubes. It is clear that the radiused con-

figuration chosen by Sheaffer, while necessitated in part by the limitations of Advance Stamping's machinery, was not "the natural or inevitable result" of such machinery. Sheaffer used extra dies to elongate. the radius to the point where any distinction between it and a "bevel" is more historical than actual.

From these beginnings Sheaffer's manufacturing of the cartridge pen went through several distinct stages which are detailed here to highlight the fact that the present Sheaffer cartridge pen is a direct descendant of the Young patent. First, Sheaffer manufactured a pierce tube which was inwardly beveled (elongated radius), the bias cut portion of which was shorter than the depth of a preformed bore in the Sheaffer cartridges. This configuration was a slavish imitation of the Young patent. Second, Sheaffer shortened the length of the preformed bore so that the bias cut portion of the pierce tube exceeded the depth of the bore. However, at the same time Sheaffer increased the thickness of the diaphragm so that the combined length of the bore and the diaphragm was still in excess of the length of the bias cut portion of the pierce tube. Both these manufactures were discontinued before the Young patent issued on August 13, 1957. Third, the angle of the bias cut was increased, but the mean length of the bore and diaphragm still exceeded the length of the bias cut portion of the pierce tube. This guaranteed that the pierce tube would seal before the diaphragm was broken. This third configuration was manufactured from December 1955 to March 1958. Fourth, the defendant switched to an outward bevel on its pierce tubes—this configuration is not charged as infringing— making the outer edge of the pierce tube the sharpened one. But, after two years, in February of 1960, Sheaffer felt obliged to return to the inwardly beveled (elongated radius) pierce tube because of leakage. The fifth and sixth changes are not consequential except that they represent a return to the inward bevel. Seventh, the pierce tube was not changed, but the diaphragm was moved to the forward end of the bore so as to substantially close the bore. The eighth change represents an insignificant alteration in the pierce tube. Both the seventh and eighth configurations have been produced from September 1961 to the present.

The current Sheaffer cartridge has no forwardly opening bore, and it is upon this characteristic that Sheaffer pins its argument on non-infringement. However, the telescoping action which advances the pierce tube toward and into the diaphragm is such that the pierce tube cuts its own bore, and seals the bias cut portion of the pierce tube in the bore so manufactured before the diaphragm is finally ruptured to place the pierce tube in communication with the ink supply. Since the pierce tube is inwardly beveled the bore which it cuts in the end of the cartridge is smaller than the outside diameter of the pierce tube, thus insuring a snug fit between the pierce tube and the bore. Thus, at the instant before the diaphragm is broken through, all the essential elements of the Young patent are present. The pierce tube's bias cut portion is sealed snugly within a bore, the inner diameter of which is such that there is a pressure seal between the outside diameter of the pierce tube and the inner diameter of the bore.

Sheaffer's history of manufacture demonstrates first a slavish adherence to the Waterman product followed by successively more drastic changes to avoid infringement. In fact, Sheaffer even went so far at one point as to outwardly bevel the pierce tube, but this produced an inferior product which had to be scrapped. Despite all of Sheaffer's alterations, the two crucial elements of the Young patent—the inward bevel, and the concept of sealing before piercing— were never successfully discarded.

The Court concludes with respect to claim 1 of the patent that a case of infringement has been made out. The pierce point manufactured by Sheaf-

fer is an infringement, and the cartridges manufactured by Sheaffer are a contributory infringement. The cartridges themselves cannot be a direct infringement because their configuration does not infringe the Young patent until they are used in conjunction with the Sheaffer pierce tube to create a bore in the forward end of the cartridge. This bore is not created until the consumer puts the Sheaffer cartridge in the Sheaffer pen and telescopes the pierce tube toward and into the forward end of the cartridge.

██ Waterman has also charged Sheaffer with an infringement of claim 2 of the patent; however, the Court finds that such a charge is not substantiated by the record. Claim 2 of the Young patent differs from claim 1 in that it recites the "supplemental seal" spoken of earlier. This supplemental seal it will be recalled is formed by the juxtaposition of the convex shape of the forward end of the cartridge and the concave seat on the feed section which surrounds the base of the pierce tube. The Sheaffer cartridge's forward end is essentially flat, and the seat which surrounds the pierce tube is also essentially flat. Therefore, any seal effected must be formed by the intersection of two flat annular configurations. The record contains testimony which indicates that should the seal between the Sheaffer pierce tube and cartridge fail, the junction of these two annular surfaces will not retard leakage. The Court finds that the Sheaffer cartridge and feed section fail to form an effective supplemental seal. Moreover, the Young patent, in this regard, must be strictly construed so that it only claims as a secondary seal a seal effected by the intersection of a convex configuration with a concave receptacle. So construed, the patent does not read on the Sheaffer article of manufacture with respect to the "supplemental seal" disclosed in claim 2.

The aforegoing and the "Findings of Fact" and "Conclusions of Law" hereafter are made in compliance with Rule 52(a), Fed.R.Civ.P., 28 U.S.C.

## FINDINGS OF FACT

1. The Young invention resides in the construction of a pen which has an ink cartridge and a pierce tube with particular characteristics designed to accomplish the sealing of the pierce tube in the cartridge before the ink supply is released so as to prevent ink leakage (DX–108, 75–76) during piercing. That seal is maintained during the use and operation of the pen until the cartridge's supply of ink is exhausted (DX–3).

The cartridge is made of polyethylene or like material and has a pre-formed bore on the end of the cartridge to be placed nearest to the pierce tube. The base or inner end of the bore is closed by a diaphragm (DX–3, Fig. 2(18), Column 2, first para.). The rear end of the pierce tube is cut on a bias and its rearmost portion is inwardly beveled to provide a sharp internal cutting edge (DX–3, Column 2, lines 27–29; Column 3, lines 18–20 and 39–41; DX–108, pp. 39–40). The axial length of the bias cut on the pierce tube is no greater than the depth of the bore of the cartridge so that the piercing end of the tube does not cut through the diaphragm of the cartridge until the bias cut portion of the tube is peripherally sealed within the bore (DX–3, Column 3, lines 30–35; Column 2, lines 41–47; claim 1, lines 30–35). As the pierce tube is advanced towards the diaphragm of the cartridge the tube will be in a sealing as well as a guiding engagement with the walls of the cartridge bore prior to the sharp edge of the tube cutting through the diaphragm thus preventing any ink flow around rather than into the tube (DX–3, Column 2, lines 43–47).

2. A supplementary seal against escape of ink is provided when the pierce tube is screwed into the cartridge by the cartridge seat position 16 being inwardly compressed when coming to rest against the concavely contoured area of the feed section 9 (DX–3, Column 2, lines 48–51). See Appendix.

3. Plaintiff relies on Claims 1 and 2 of the patent to charge infringement

against defendant. Claim 2 is essentially identical to Claim 1 except for the additional provision for the supplementary seal.

4. Claim 1 of the patent reads as follows:

"1. In a fountain pen, a rear barrel and a forward feed section, a single hollow open-ended rigid ink piercing and conducting tube fixed axially in said feed section and projecting therefrom, said tube being cut on a bias at its rear end and having its rearmost portion inwardly beveled to provide an internal sharp cutting edge, a liquid ink containing cartridge consisting essentially of an elongated integral substantially cylindrical envelope of resilient plastic material such as polyethylene which it longitudinally stiff but with side walls that are laterally deformable under manual pressure disposed mainly in said barrel and formed at its forward end adjacent the feed section with a small smooth forwardly open bore sized to snugly and sealingly slidably receive said tube, and an integral thin diaphragm of said material extending transversely across the bottom of said bore, said bore being longer axially than the bias cut end portion of said tube so that when said cartridge and said feed section are axially moved toward each other the tube will peripherally seal within said bore before the sharp edge of said tube cuts through said diaphragm."

5. Claim 2 reads as follows, the provisions for a supplementary seal being *underscored*:

"2. In a fountain pen, a rear barrell and a forward feed section, a single hollow open-ended rigid ink piercing and conducting tube fixed axially in said feed section and projecting therefrom, said tube being cut on a bias at its rear end and having its rearmost portion inwardly beveled to provide an internal sharp cutting edge, *means on said feed section providing an annular seating surface surrounding said tube,* a liquid ink containing cartridge, consisting essentially of an elongated integral substantially cylindrical envelope of resilient plastic material such as polyethylene which is longitudinally stiff but with side walls that are laterally deformable under manual pressure disposed mainly in said barrel and formed at its forward end adjacent the feed section with a smooth small bore sized to snugly and sealingly slidably receive said tube, *said cartridge being exteriorly formed to provide an annular seating surface surrounding said bore adjacent the forward open end thereof,* and an integral thin diaphragm of said material extending transversely across the bottom of said bore spaced materially inwardly of the forward open end of said bore, said bore and tube being of such relative lengths and such snugly interfitting peripheral dimensions that when said cartridge and said feed section are axially moved toward each other the tube is peripherally sealed within said bore before the sharpened end of said tube cuts through the diaphragm, and *said seating* surfaces being engaged after the tube has pierced and its end has entered into the interior of the cartridge so that a supplementary ink seal is thereby provided."

6. The patent in suit issued only after a lengthy prosecution and consideration by the Patent Office of 10 United States and 7 foreign patents (DX–5, T 1239–41; DX–113, 113A).

7. The Patent Office rejected all the claims as being unpatentable over the prior art after which the attorney who prosecuted the patent held a final interview with the Examiner in the Patent Office which resulted in an amendment to the claims to recite the rear cutting edge (leading piercing edge) of the pierce tube as being "inwardly beveled". The claims with this amendment were

allowed. At the final interview all the prior art patents were taken up one at time and disposed of (DX–5, T 1239).

8. The patents relied on by the defendant at trial are the following United States and British Patents:

## U. S. Patents

| | | |
|---|---|---|
| Erickson | 849,110 | (DX–110A) |
| Salz | 1,777,736 | (DX–110B) |
| Holstein | 1,811,317 | (DX–110C) |
| Reynolds | 2,368,425 | (DX–110D) |
| Barnhart | 2,187,259 | (DX–110F) |
| Del Piero | 2,785,656 | (DX–110G) |
| Torchi | 2,961,999 | (DX–110H) |
| Williams | 2,931,338 | (DX–110 "EYE") |
| Miessner | 2,669,223 | (DX–110J) |

## British Patents

| | | |
|---|---|---|
| 30,128 | of 1910 | (DX–111A) |
| 578,390 | of 1945 | (DX–111B) |

Of the patents listed above Holstein No. 1,811,317 and French Patent Del Piero No. 790,738, which corresponds to U. S. Patent No. 2,785,656, and Miessner No. 2,669,223 were considered in the course of the Patent Office prosecution (DX–5). Although British Patent 30,128 (DX–111A) was admitted in evidence (T 37), no further reference is made to this patent in the trial record, or in the post trial briefs.

9. The Erickson patent, No. 849,110 (DX–110A), considered by Dr. Ziegler, defendant's expert, to be the closest single reference (T 1193), discloses a fountain pen with a bias cut pierce tube and a disposable cartridge with a forwardly open depression which serves as a guide to the point (T 1028–33). However, the Erickson patent does not show a pierce tube having its inner edge sharpened— i. e., inwardly beveled—and there is no direct teaching in the printed text of a bore having a greater depth than the axial length of the bias cut portion of the tube (T 1190–91). In fact, the only specific provision for an affirmative seal in the pen is shown in Fig. 7 of the patent where a collar e forms a gasket for the parts A and B (T 1193). Furthermore, the patent indicates that leakage is anticipated between the pierce tube and the cartridge (Column 2, lines 69–82).

10. The Reynolds patent, No. 2,368,-425 (DX–110D), shows a fountain pen with a cartridge and a bias cut pierce tube, the cartridge having a soft rubber plug 10 in its forward end (DX–110D, p. 1, column 1, line 43). The patent does not describe the pierce tube as being cut on a bias but describes the tube as "beveled off along one side as at 19 to form a puncturing needle or spike" (DX–110D, p. 1, column 2, lines 9–10). There is no disclosure in Reynolds of forming a bore for the purpose of peripherally sealing the pierce tube before piercing (T 1201). The purpose of using the needle configuration of the Reynolds patent is to pierce a small hole in the rubber plug without pushing the plug out of position (T 1205).

The Patent Office had already considered patents which were the full equivalent to Reynolds in this respect. First, French Del Piero patent No. 1,073,346 (DX–113), which teaches that in the use of a spike device with rubber, one forms a small hole which is capable of resealing when the spike is withdrawn (T 1201). Second, French patent No. 790,-738 (DX–113; 113A, p. 2 of translation), which also describes the piercing ele-

ment as a spike 7 employed to pierce a diaphragm which is a rubber washer.

11. The Barnhart patent (DX–110F), teaches a hypodermic needle. The configuration of the piercing end of the needle is merely sharpened (chamfered) off like a chisel (T 1205–10) for the sole purpose "[of providing] a novel point to facilitate injection" (DX–110F, p. 2, column 2, line 28; PX–180A–C; T 1214). The Barnhart type pierce point will not work with a Sheaffer cartridge without leakage (PX–181; T 1215).

12. The Torchi patent, No. 2,961,999 (DX–110H) claims only a ball and chain adapted to swing freely and strike against the body of the pen when one of the two ink cartridges is missing. There is no teaching in this patent that the pierce tube fits snugly in the bore (T 1041–44; DX–110H), although the patent does teach a preformed bore. The patent does not show an inwardly beveled pierce tube configuration as claimed in the patent in suit, and does not teach the principle of sealing before piercing (DX–110H).

13. The filing date of the patent in suit is December 16, 1954 (DX–3). The date of conception however is on or before December 9, 1953, the date of the drawing showing the configuration of the cartridge and the inwardly beveled pierce tube (DX–74; DX–108, pp. 53–54). The United States filing date of the Torchi patent is July 27, 1954 (DX–110H); the foreign filing date of the Torchi patent is August 26, 1953 (DX–110H).

14. The Duo-Cart pen (DX–123) is an embodiment of the Torchi patent. This pen was examined by Martin and Gordon in July 1954 (T 405–08), but there is no evidence that the Duo-Cart structure was adopted by Sheaffer.

15. The Holstein patent, No. 1,811,-317 (DX–110C) describes a fountain pen having a cartridge closed by a rubber plug at one end and a straight bias cut pierce tube designed to pierce an integral diaphragm which is positioned at the leading end of a bore (T 1049–53). This patent discloses nothing more than what

was considered by the Patent Office (DX–5, p. 84; DX–113; T 1201; T 1203).

16. The Miessner patent, No. 2,669,-223 (DX–110J) discloses a fountain pen having an ink reservoir of polyethylene. This patent does not teach a cartridge fountain pen; it teaches a regular ink fluid fountain pen in which the barrel itself is the reservoir and is filled by squeezing its laterally deformable side walls. This patent was cited during the prosecution of the Young patent and is relied upon by defendant only to show an ink reservoir that has laterally deformable side walls (T 1053–54).

17. The Salz patent, No. 1,777,736 (DX–110B) shows a cartridge-type fountain pen in which the cartridge has a frangibly connected cap 17a which is displaced inwardly as a whole by a feed tube 12 which is not cut on a bias. This patent does not disclose sealing of the penetrating element before penetration into the cartridge. The pertinent language with regard to sealing of this patent appears at page 2, lines 29–36. It speaks of a gripping of a collar 17c around a neck portion 20 of the feed section and not about the feed tube itself (T 1056).

18. The Williams patent, No. 2,931,-338 (DX–110 "EYE"), which is based on an application filed August 7, 1958 as a continuation of an earlier application filed February 1, 1954, relates solely to a method of fabricating a cartridge from two lengths of tubing in a molding operation (DX–110 "EYE", column 1, lines 22–28; column 2, lines 12–17). The configuration of the cartridge whose molding Williams teaches was conceived by Young (DX–108, pp. 63–64, 70–72, 83, 91, 122, 158–60, 168–70, 183). This patent is owned by plaintiff.

Also Williams' application was filed less than one year before the filing date of the patent in suit, i. e., February 1, 1954 (DX–110 "EYE"). Plaintiff's conception date is not later than December 9, 1953 (DX–108, p. 170; DX–74) with diligent reduction to practice

not later than September 1954 (PX–66; PX–150A).

19. The British patent, No. 578,390 (DX–111B) shows only a disposable cartridge fountain pen having a bias cut pierce tube which penetrates a rubber diaphragm at the forward end of a cartridge. None of the features of the Young structure are shown. This patent states that the piercing member is "somewhat similar to a surgical injection needle," (p. 3, column 2, lines 96–97).

20. The Del Piero patent, No. 2,785,-656 (DX–110G) corresponds to French patent No. 790,738 which was cited during the prosecution of the Young patent (DX–113A). It discloses a cartridge pen with a tapered pierce tube 11 quite common to many other tubes reflected in the cited art. It does not suggest Young's combination, as the Patent Office found (DX–5). A model of Del Piero's pen (DX–122) was demonstrated to defendant in the summer of 1952 and was rejected (T 847–50; 890).

21. The art relied upon by defendant which was not considered by the Patent Office does not differ in substance from the art considered by the Patent Office in the course of the prosecution.

22. The novelty of Young's invention is confirmed by the fact that no anticipation of it has been asserted or shown by defendant.

23. The Young invention was not obvious to those in the writing instrument art. This finding is confirmed by the following facts:

a) No prior art reference nor any combination of prior art references suggested the use of Young's pierce tube and cartridge in a writing instrument;

b) No prior art reference nor any combination of prior art references suggested the use of Young's supplementary seal in combination with his pierce tube and cartridge in a writing instrument;

c) Defendant discarded its A35–14 pierce tube (PX–137) in favor of a different configuration of pierce tube (PX–138; PX–34) after notice of infringement from plaintiff (PX–87; T 918–19).

It returned to the original A35–14 pierce tube after experience indicated that its A35–22 (PX–138) pierce tube was commercially undesirable (T 920; PX–64) and on advice of counsel eliminated a preformed bore in its cartridges (PX–135) after realizing that it could not tolerate a departure from its A35–14 (PX–140) pierce tube (PX–173, pp. 66–67; PX–95);

d) No one at Sheaffer realized the criticality of an inwardly beveled pierce tube (A35–14) prior to observing Waterman's specimens commencing in September 1954 (T 433; PX–160; PX–160 A);

e) Even Olson, defendant's Patent Counsel and Director of Research and Development, did not realize the criticality of the inward bevel on defendant's pierce tubes when he ordered the A35–14 configuration discarded after receiving notice of infringement from plaintiff (PX–34; PX–87; T 918–19);

f) Gordon, Manager of defendant's Development Department, did not regard a change of the A35–14 pierce tube desirable (PX–163, pp. 109–15; T 736). He and those under him realized its importance after a thorough study of the Waterman specimens had been made (PX–34; PX–16; PX–17);

g) Defendant copied the Waterman specimens after they came on the market (PX–66; PX–99, pp. 18, 19; PX–25, 28, 69, 81–84, 160, 160A);

h) The evidence introduced does not indicate that there was in this country a commercially acceptable cartridge pen before Waterman. The Del Piero (DX–122) and Duo-Cart (DX–123) pens were examined by the defendant but neither was adopted (T 553, 566), and there is no evidence relating to the commercialization of these pens (T 888–90) in the United States. No physical specimens of pens based on the patents relied on by the defendant as evidence of prior art with the exception of Del Piero and Duo-Cart pens were produced. Absent a satisfactory explanation the only inference to be drawn is that the patents relied on other than Del Piero or Torchi

(which is not prior art) are paper patents or were never commercially successful;

i) The introduction of a cartridge pen in 1954 by Waterman satisfied a long felt need in the writing instrument field not only because of the recognized disadvantages of old-style wet pens but because of the public's desire for a wet pen incorporating the advantages of a ball point pen (T 40; DX–110G; PX–98, p. 12). This is further evidenced by the more than 40 patents cited by defendant (Pretrial Order), by defendant's consideration over the years of various ideas for cartridge pens, some of which were its own (PX–73–77; PX–154A–C), some of which in physical form had been brought to it, such as Dr. Del Piero's (DX–122) and the Duo-Cart (DX–123), and some of which in the form of ideas had been submitted by the public (PX–164, 165, 167, 168, 169, 170).

24. All fountain pens identified in Section (c), paragraph 6 of the Pretrial Order made and sold by defendant since the issuance of the Young patent have infringed and do infringe claim 1 of such patent if such fountain pens incorporate the A35–14 pierce tube as identified in drawing A35–14 and revisions thereof (PX–136, 137, 139 and 140), and use of that pierce tube with either the A35–13 or A35–25 cartridges (PX–130, 132, 135), for the following reasons:

a) All A35–14 pierce tubes (PX–136, 137, 139 and 140) are cut on a bias at their rear end and have an internal sharp cutting edge provided by the rearmost portion being inwardly beveled (T 121);

b) Sheaffer's A35–14 commercial pierce tubes are not the inherent result of a normal eyelet machine operation but are rather the result required by Sheaffer and obtained by the use of special dies designed by Advance Stamping to obtain Sheaffer's required configuration (T 742, 753–54, 769–71, 793);

c) All A35–13 (PX–130, 132) and A35–25 (PX–135) cartridges have the following features: They are liquid ink-containing with an elongated integral cylindrical envelope of polyethylene which is longitudinally stiff but with side walls that are laterally deformable under manual pressure; a small smooth forwardly open bore sized to snugly and sealingly receive all A35–14 pierce tubes; an integrally thin diaphragm of resilient material extending transversely across the bottom of the bore, such bore and diaphragm together being longer axially than the bias cut end portion of all A35–14 pierce tubes so that when these cartridges and the feed section employing A35–14 pierce tubes are axially moved toward each other, all A35–14 pierce tubes will peripherally seal within the bore before the sharp edge of the tube cuts through the diaphragm;

d) In all A35–13 cartridges (PX–130, 132) a forwardly open bore therein is preformed during manufacture;

e) A35–25 cartridges (PX–135) contain a rearwardly open bore formed during manufacture which is intended to facilitate the creation of a forwardly open bore (T 120–24);

f) Such a forwardly open bore is created during the piercing operation so that just prior to penetration of the diaphragm, A35–25 cartridges are in such condition that all elements required of Young's cartridges are present (PX–143, 143A, 144, 144A, 145A, 145B; T 128–36, 145, 170–74, 304–05, 324–25, 1096).

25. All fountain pens identified in Section (c), paragraph 6 of the Pretrial Order made and sold by defendant since the issuance of the Young patent did not infringe and do not infringe claim 2 of the patent. In the Sheaffer cartridge pen there is no supplementary ink seal formed between annular seating surfaces on the cartridge and the feed section supporting the pierce tube (DX–3, col. 3, lines 41–44, 51–53, 61–64) as specified in claim 2 of the patents (Gordon Dep.; PX–163, pp. 91–92, 115–17). Tests carried out by experts for plaintiff and defendant (Smith, T 311–14; Ziegler, T–977–86; DX–127A and B) have shown that these surfaces do not provide a seal even though they are in engagement

(PX–147A and B). Further, the Sheaffer configuration if it did effect a seal would not infringe claim 2 of the patent in suit since the seal would be made by joining the annular surface of the cartridge and the annular surface of the feed section, not by the convex configuration of the bore end of the Waterman cartridge being telescoped and squeezed into a sealing position by its contact with the concave surface of the feed section.

26. The evidence not being clear and convincing, the Court cannot find that Young made false and misleading statements to the Patent Office in his affidavit of September 6, 1956, for the following reasons:

a) It is not clear that the use of the word "samples" in paragraph 6 of Young's affidavit (DX–5, p. 73) actually refers to physical specimens;

b) If "samples" refers to physical specimens, it is not clear that Young did not see more than one physical specimen since it is possible that he saw a Pollock pen in addition to a "Jif" (DX–108, pp. 27, 111, 112).

27. Young's affidavit to the Patent Office did not result in an allowance of any claim.

28. Young's affidavit did not have the effect of eliminating from Patent Office consideration as prior art any of the "samples" referred to in his affidavit including Pollock Patent No. 1,-658,940 and French Patent No. 790,738 (Calvet) (T 1239). Furthermore, the defendant does not rely on Pollock Patent No. 1,658,940 or the French Patent No. 790,738.

## CONCLUSIONS OF LAW

1. Williams' patent No. 2,931,338 is not valid prior art under Section 102 of the Patent Act since the original application upon which it is based was filed less than a year before the filing date of the Young patent and since Young conceived his invention prior to the filing date of Williams' application and diligently reduced it to practice (DX–108, p. 170; DX–108, p. 204; DX–89; DX–74).

2. The Torchi patent (Duo-Cart pen) is not prior art since its United States filing date was July 27, 1954 whereas Young's date of conception was December 9, 1953. Although the Torchi patent has a foreign filing date of August 26, 1953, the foreign filing date is not relevant when the patent is asserted as prior art. Application of Hilmer, 359 F.2d 859 (C.C.P.A. 1966).

3. The representations made by Young to the Patent Office in his affidavit of September 6, 1956 were not material to the issuance of the patent, and cannot support a charge of fraud on the Patent Office. Armour & Co. v. Wilson & Co., 274 F.2d 143, 148 (7th Cir. 1960); Corning Glass Works v. Anchor Hocking Glass Corp., 253 F.Supp. 461, 469 (D.Del.1966), rev'd other gr'ds, 374 F. 2d 473 (3d Cir. 1967); Baldwin-Lima-Hamilton Corp. v. Tatnall Meas. Sys. Co., 169 F.Supp. 1, 21 (E.D.Pa.1958), aff'd per curiam, 268 F.2d 395 (3d Cir. 1959), cert. den. 361 U.S. 894, 80 S.Ct. 190, 4 L.Ed. 151 (1959).

4. Claims 1 and 2 of United States Letters Patent No. 2,802,448 are valid and enforceable.

5. Defendant has infringed claim 1 of United States Patent No. 2,802,448 by making and selling fountain pens incorporating the A35–14 pierce tube and revisions thereof (PX–136, 137, 139, 140) and the A35–13 or the A35–22 cartridge (PX–130, 132, 135) and revisions thereof. Although the fountain pens are unassembled when sold by defendant, defendant put such pens in condition for infringement upon assembly by a user.

6. Claim 2 of United States Letters Patent No. 2,802,448 has not been and is not infringed by the manufacture and sale of any of the fountain pens enumerated in Section C, paragraph 6 of the Pretrial Order.

7. Defendant contributorily infringes claim 1 of United States Patent No. 2,-802,448 by making and selling either the A35–13 or A35–22 cartridges and revisions thereof (PX–130, 132, 135) for use in fountain pens with A35–14 pierce tubes and revisions thereof (PX–136, 137, 139, 140). Defendant sells such car-

tridges in condition for infringement upon assembly by a user.

8. Plaintiff is entitled to a decree in accordance herewith.

## APPENDIX "A"

Aug. 13, 1957 · D. H. YOUNG 2,802,448

FOUNTAIN PEN CONSTRUCTION AND INK CARTRIDGE THEREFOR

Filed Dec. 16, 1954

INVENTOR
DONALD H. YOUNG
BY
Burgess Ryan & Hile
ATTORNEYS

UNITED STATES PATENT OFFICE

2,802,448

Patented Aug. 13, 1957

2,802,448

## FOUNTAIN PEN CONSTRUCTION AND INK CARTRIDGE THEREFOR

Donald H. Young, Southbury, Conn., assignor to Waterman Pen Company, Inc., New York, N. Y., a corporation of New York

Application December 16, 1954, Serial No. 475,716

4 Claims. (Cl. 120—45.4)

This invention relates generally to fountain pens of the type in which the ink is contained in a cartridge which is normally discarded when empty, the ink supply being replenished by the insertion of a full cartridge. The cartridge is housed in the barrel of the pen and is impaled on a rearwardly projecting piercing tube which serves to conduct the ink to the feed section of the pen from which it flows to the nib.

One of the major objects of the invention is to provide a pen construction and a cooperating cartridge so organized that both during the operation of inserting and piercing the cartridge and during normal use of the pen, there is no danger of leakage of ink. As will appear later, the operation of replacing an exhausted cartridge with a new one is simple and foolproof.

A further object of the invention is to provide a cartridge which, for emergency use, can be at least partially refilled.

The invention will be readily understood from the following description of the accompanying drawings, in which:

Fig. 1 is an elevation largely in longitudinal section, of a fountain pen incorporating a preferred form of the invention;

Fig. 2 is an enlarged longitudinal section of a portion of the pen showing the cartridge prior to piercing;

Fig. 3 is a similar section showing the cartridge after piercing; and

Fig. 4 is a transverse section on the line 4—4 of Fig. 3.

The pen consists of a barrel, generally designated 1, and what will be referred to as a feed section, generally designated 2, carrying a nib 3. As a matter of convenience, the nib end of the pen will be referred to as the forward end and the other end as the rear, and the use of the terms "front," "rearwardly" etc. in describing the various components will be understood to conform to those designations.

In this instance, a coupling member 4 serves to unite the barrel and feed sections, its forward threaded end 5 engaging the feed section and its rear threaded end 6 receiving the barrel. The coupling member is turned up tight in the feed section, as by a wrench inserted in holes 7, and for present purposes can be thought of and will be treated as part of the feed section. The barrel is simply turned up finger tight against ring 8, so as to be readily removable.

The rear or barrel end of the feed section incorporates a cartridge receiving cavity and a cartridge seat and a rearwardly projecting piercing tube adapted to penetrate the front end of a cartridge housed in the barrel. The cartridge seat, marked 9 (Fig. 2) is actually formed in the coupling member and, as illustrated, is preferably of conical, concave form. Piercing tube 10, protruding rearwardly from the center of the cartridge seat, extends part way back in the coupling member cavity or hollow interior 11 (Fig. 2). It will be understood that the position of the piercing tube relative to the coupling member is fixed.

An ink cartridge, generally designated 15, is adapted to be housed in barrel 1. The forward end of the cartridge is shaped to form a convex conical seat portion 16 and incorporates a bore 17 the base or inner end of which is normally closed by a restricted diaphragm area or wall 18 (Fig. 2). In this instance the

cartridge is designed to be filled from the other end 19 (Fig. 1) which, after filling, is suitably sealed. A cartridge spring 20, terminating in a cup 21, is mounted in the rear end of a barrel.

The front end of the cartridge is a sliding fit in cavity 11 and the piercing tube is a snug fit in the cartridge bore 17. Accordingly, with the barrel removed, the cartridge can be inserted to its Fig. 2 position in which it is supported in the feed section both by the cavity wall and by the piercing tube. In other words, it is necessarily positioned properly and cannot teeter or get out of alignment as the barrel is slid over it. As will be understood, screwing the barrel home serves to telescope the cartridge bore and piercing tube, causing the latter to penetrate the diaphragm wall and place the tube in communication with the ink supply. The detals of the feed section construction and the control of the ink flow through the tube and to the nib form no part of the present invention and, hence, will not be described.

The ink cartridge is made of polyethylene, or like material, which is readily pierced by the sharpened end of tube 10. As will be noted, the tube is shown sharpened on its inner edge 25 (Fig. 3) rather than on its outer edge and the end 26 of the tube is cut on the bias. In the result, the diaphragm wall 18 is not completely severed but is partially cut out and forced back as the tube and cartridge are telescoped, leaving a more or less hinged flap 27 which, being still attached, cannot float around in the cartridge and possibly clog the tube outlet.

As mentioned above, the piercing tube 10 is a snug fit in the cartridge bore 17 and it will be recognized that sharpening the tube end on its inner rather than its outer edge has the further advantage of minimizing the risk of the tube end gouging into the wall of the bore.

It will also be noted that the diaphragm bore is of a length greater than that of the bias cut portion of the tube end. Accordingly, the body of the tube is seen to be in sealing as well as guiding engagement with the wall of the bore before the tip of the tube penetrates the diaphragm wall, thus guarding against any flow of ink around rather than into the tube.

As the barrel is screwed home the cartridge seat portion 16 comes to rest against the feed section seat 9, thus effecting a second seal against the escape of ink around the piercing tube and into the barrel. The spring 20, with its cap 21 abutting the rear end of the cartridge, serves to maintain the cartridge in close engagement with its seat.

As illustrated in Fig. 3, the angle of conicity of seat 9 is preferably greater than that of seat portion 16 of the cartridge, so that, under the influence of spring 20, a squeezing action is applied against the periphery of the forward extremity of the cartridge. By this means, any tendency of the polyethylene to "flow" and thereby loosen the original snug fit of the tube in the bore is overcome, the sealing fit being maintained indefinitely.

When the ink supply is exhausted, the normal procedure is to unscrew the barrel from the feed section, withdraw the empty cartridge and insert a new one in the manner already described. However, by making the cartridge of such material as polyethylene the wall of the body portion can readily be made of such thinness as to be collapsible by squeezing although stiff enough to be quite rigid lengthwise. Accordingly, if a new cartridge is not immediately available, some ink can be drawn into the exhausted cartridge by squeezing and relaxing it, just as an eye dropper is filled. For this purpose, the nib end of the pen can be immersed in ink, squeezing and relaxing the cartridge body without removing it from the feed section, or the cartridge can be removed and similarly replenished. As will be recognized, the restricted cartridge bore functions in the manner of the restricted tip of an eye dropper and a sufficient supply of ink for temporary use can be drawn into the cartridge and without any objectionable back flow or drip.

It will be apparent that the described embodiment of the invention, while having the special advantages noted and

hence preferred, is illustrative and susceptible to modification without departing from the principles of the invention. Accordingly, the following is claimed:

1. In a fountain pen, a rear barrel and a forward feed section, a single hollow open-ended rigid ink piercing and conducting tube fixed axially in said feed section and projecting therefrom, said tube being cut on a bias at its rear end and having its rearmost portion inwardly beveled to provide an internal sharp cutting edge, a liquid ink containing cartridge consisting essentially of an elongated integral substantially cylindrical envelope of resilient plastic material such as polyethylene which is longitudinally stiff but with side walls that are laterally deformable under manual pressure disposed mainly in said barrel and formed at its forward end adjacent the feed section with a small smooth forwardly open bore sized to snugly and sealingly slidably receive said tube, and an integral thin diaphragm of said material extending transversely across the bottom of said bore, said bore being longer axially than the bias cut end portion of said tube so that when said cartridge and said feed section are axially moved toward each other the tube will peripherally seal within said bore before the sharp edge of said tube cuts through said diaphragm.

2. In a fountain pen, a rear barrel and a forward feed section, a single hollow open-ended rigid ink piercing and conducting tube fixed axially in said feed section and projecting therefrom, said tube being cut on a bias at its rear end and having its rearmost portion inwardly beveled to provide an internal sharp cutting edge, means on said feed section providing an annular seating surface surrounding said tube, a liquid ink containing cartridge consisting essentially of an elongated integral substantially cylindrical envelope of resilient plastic material such as polyethylene which is longitudinally stiff but with side walls that are laterally deformable under manual pressure disposed mainly in said barrel and formed at its forward end adjacent the feed section with a smooth small bore sized to snugly and sealingly slidably receive said tube, said cartridge being exteriorly formed to provide an annular seating surface surrounding said bore adjacent the forward open end thereof, and an integral thin diaphragm of said material extending transversely across the bottom of said bore spaced materially inwardly of the forward open end of said bore, said bore and tube being of such relative lengths and such snugly interfitting peripheral dimensions that when said cartridge and said feed section are axially moved toward each other the tube is peripherally sealed within said bore before the sharpened end of said tube cuts through the diaphragm, and said seating surfaces being engaged after the tube has pierced and its end has entered into the interior of the cartridge so that a supplementary ink seal is thereby provided.

3. In a fountain pen, a rear barrel and a forward feed section, a single hollow open-ended rigid ink piercing and conducting tube fixed axially in said feed section and projecting therefrom, said tube being cut on a bias at its rear end and having its rearmost portion inwardly beveled to provide an internal sharp cutting edge, means on said feed section providing an inclined annular rigid seating surface surrounding said tube, a liquid ink containing cartridge consisting essentially of an elongated integral substantially cylindrical envelope of resilient plastic material such as polyethylene which is longitudinally stiff but with side walls that are laterally deformable under manual pressure disposed mainly in said barrel section and formed at said forward end adjacent the feed section with a small smooth bore sized to snugly and sealingly slidably receive said tube, said cartridge being formed exteriorly to provide an inclined annular rigid seating surface surrounding said bore adjacent the forward open end of said bore, and an integral thin diaphragm of said material extending transversely across the bottom of said bore spaced materially inwardly of the forward open end of said bore, said bore and tube being of such proportions that

when said cartridge and said feed section are axially moved toward each other the tube end first peripherally seals within said bore and then cuts through said diaphragm before the said seating surfaces are tightly engaged to provide a supplementary ink seal.

4. In a fountain pen, a rear barrel and a forward feed section, a single hollow open-ended rigid ink piercing and conducting tube fixed axially in said feed section and projecting therefrom, said tube being cut at a bias at its rear end and having its rearmost portion inwardly beveled to provide an internal sharp cutting edge, means on said feed section providing an inclined annular rigid seating surface surrounding said tube, a liquid ink containing cartridge consisting essentially of an elongated integral substantially cylindrical envelope of resilient plastic material such as polyethylene which is longitudinally stiff but with side walls that are laterally deformable under manual pressure disposed mainly in said barrel section and formed at said forward end adjacent the feed section with a small smooth bore sized to snugly and sealingly slidably receive said tube, said cartridge being formed exteriorly to provide an inclined annular rigid seating surface surrounding said bore adjacent the forward open end of said bore, said seating surface on the cartridge being inclined with respect to the axis of the pen at a smaller angle than said seating surface on said feed section, and an integral thin diaphragm of said material extending transversely across the bottom of said bore spaced materially inwardly of the forward open end of said bore, said bore and tube being of such proportions that when said cartridge and said feed section are axially moved toward each other the tube end first peripherally seals within said bore and then cuts through said diaphragm before the said seating surfaces are tightly engaged to provide a supplementary ink seal.

References Cited in the file of this patent

UNITED STATES PATENTS

| | | |
|---|---|---|
| 1,658,940 | Pollock | Feb. 14, 1928 |
| 1,724,106 | Pollock | Aug. 13, 1929 |
| 2,233,846 | Packard | Mar. 4, 1941 |
| 2,615,446 | Lingenfelter | Oct. 22, 1952 |
| 2,629,362 | Muench | Feb. 24, 1953 |
| 2,657,431 | Slaughter | Nov. 3, 1953 |
| 2,669,223 | Miessner | Feb. 16, 1954 |
| 2,702,034 | Walter | Feb. 15, 1955 |

FOREIGN PATENTS

| | | |
|---|---|---|
| 321,847 | Germany | June 15, 1920 |
| 818,824 | France | June 28, 1937 |
| 911,164 | France | Mar. 4, 1946 |
| 1,047,934 | France | July 29, 1953 |
| 1,078,557 | France | May 12, 1954 |