**In re MULTIDISTRICT LITIGATION INVOLVING FROST PATENT.***

**No. 46.**

United States District Court, D. Delaware.

April 11, 1975.

* See Appendix for actions involved.

Arthur G. Connolly, Jr., and John R. Bowman, of Connolly, Bove & Lodge, Wilmington, Del., John T. Kelton, Herbert Blecker, Robert Kosinski, and Robert J. Eichelburg, of Watson, Leavenworth, Kelton & Taggart, New York City, and Frank C. Rote, Akron, Ohio, for The General Tire & Rubber Co.

David F. Anderson, of Potter, Anderson & Corroon, Wilmington, Del., Thomas F. Reddy, Jr. and Sidney Bresnick, of Pennie & Edmonds, New York City, for Reichhold Chemicals, Inc., in Civ. A. No. 3867.

C. Waggaman Berl, Jr., Wilmington, Del., John D. Foley, of Morgan, Finnegan, Pine, Foley & Lee, New York City, and Neal T. Levin, Morristown, N. J., for Diamond Shamrock Corp. in Civ. A. No. 3868.

Howard L. Williams, of Morris, James, Hitchens & Williams, Wilmington, Del., and Warren D. McPhee, of Mason, Kolehmainen, Rathburn & Wyss, Chicago, Ill., for Upjohn Company in Civ. A. No. 3866.

C. Walter Mortenson and Charles A. Weigel, Jr., of Mortenson & Weigel, Wilmington, Del.

John J. Mackiewicz, of Woodcock, Washburn, Kurtz & Mackiewicz, Philadelphia, Pa., and Jordon J. Driks, of Witco Chemical Company, New York City, for Isocyanate Products, Inc. and Murphy Body Works, Inc. in Civ. A. No. 3183.

Richard L. Sutton, William O. La-Motte, III, and Douglas E. Whitney, of Morris, Nichols Arsht & Tunnell, Wilmington, Del., James R. Sweeney, and J. Robert Stapleton, of Coffee & Sweeney, Chicago, Ill., for Jefferson Chemical Co., Inc. in Civ. A. No. 3910.

Clair John Killoran and Andrew G. T. Moore, II, of Killoran & Van Brunt, Wilmington, Del., W. Philip Churchill, and Paul C. Flattery, of Fish & Neave, New York City, and Gordon W. Hueschen, Kalamazoo, Mich., for Wyandotte Chemicals Corp. in Civ. A. Nos. 3944 and 4665.

David F. Anderson and William Poole, of Potter, Anderson & Corroon, Wilmington, Del., and John Boustead, of McLean, Morton & Boustead, New York City, for Olin Corp. in Civ. A. Nos. 3945 and 4688.

## OPINION

WRIGHT, Senior District Judge.

This controversy involves Patent No. 3,072,582 (the Frost Patent), which is assigned to General Tire & Rubber Company (General), and is the subject of litigation in several United States District Courts.[1] Under the procedures provided by 28 U.S.C. § 1407, the Panel on Multidistrict Litigation transferred two of the cases filed elsewhere to this Court for the limited purpose of directing discovery and disposing of pretrial motions. The remaining case filed elsewhere was transferred to this District pursuant to 28 U.S.C. § 1404(a). Subsequently, the defendants in the suits transferred pursuant to § 1407 filed declaratory judgment actions in this District against General. Those declaratory judgment actions were then consolidated with the action transferred pursuant to § 1404(a) and the actions previously brought in this District, and a trial involving all of the parties was possible.

On December 19, 1972, this Court filed an unreported opinion and order denying a motion by four of the defendants[2] for summary judgment. That motion had urged that the patent involved in this litigation was invalid or unenforceable because of fraud on the Patent Office, i. e., because of improper conduct by the assignee General in the prosecution of the patent application. Although that motion was denied, this Court subsequently held, in a opinion reported at 178 U.S.P.Q. 391 (1973), that the issue of fraud was separable from the other issues and that a separate trial on that issue would be appropriate under Rule 42(b) Fed.R.Civ.P. That trial has now been held.

In its opinion denying summary judgment, this Court discussed in some detail the history of the prosecution of the Frost patent. In view of the fact that that opinion was not reported, much of that background will be repeated here.

---

1. General brought actions for patent infringement against Reichhold Chemicals, Inc., Diamond Shamrock Corporation, The Upjohn Company, and Isocyanate Products, Inc. in the District of Delaware; against Wyandotte Chemical Corporation in the Eastern District of Michigan; against Olin Corporation in the Western District of Virginia; and against Jefferson Chemical Company, Inc. in the Southern District of New York. Isocyanate Products, Inc. and Murphy Body Works brought a suit for a declaratory judgment against General in the District of Delaware.

2. The summary judgment motion was brought by Jefferson Chemical Company, The Upjohn Company, Isocyanate Products, Inc., and Murphy Body Works. For convenience, all parties opposing General in this litigation are referred to as the defendants.

## THE INVENTION

The Frost patent is the result of work performed by Charles Frost, an employee of General. The patent claims a particular method of making polyether urethane foams,[3] and also claims those foams so made. Polyurethane foams are a commercially successful product with a variety of uses. If the foams are formulated so as to be flexible, they are useful in applications such as cushions for upholstery. If they are formulated so as to be rigid, they find utility as thermal insulation. In addition to having a low thermal conductivity, the rigid type of polyurethane foam can be formed in place and lends structural support to the containers it insulates. Thus, rigid polyurethane foam is advantageously incorporated in refrigerators and in refrigerated trailers and railroad cars.

Polyurethanes are the product of a polymerization reaction whereby molecules having hydroxyl (OH) groups, called polyols, are joined through those groups with molecules having isocyanate groups (NCO). In one method of preparation, a polyol, a polyisocyanate, a so-called "cross linking agent", and a suitable reaction catalyst are mixed together in the presence of a gas-forming material, commonly called a "blowing agent". A reaction occurs whereby a urethane is produced, and the simultaneous formation of a gas causes the urethane to foam, the process being crudely analogous to the rising of bread from yeast-containing dough. Alternatively, some of these reagents can be mixed first, in the absence of a blowing agent, to form a "prepolymer". This prepolymer is subsequently blended with the remaining reagents and the blowing agent to react and form the foam. Accordingly, it is possible to prepare foams using either a single step (one-shot) or two-step method.[4]

The degree of rigidity of the foam depends to a large extent on the amount of cross linking [5] present in the final product. The amount of cross linking can be controlled by the choice of the polyol and polyisocyanate used and can be further affected by the addition of certain materials called cross linking agents which form additional cross links.

The actual chemistry involved in making urethane foams was known at the time Frost made his invention and is not the subject of the Frost patent. Rather, the Frost patent is concerned with particular blowing agents, i. e., those additives in the process which form a gas and cause the urethane to expand into a cellular structure.

Prior to the Frost invention, one of the methods used to blow foams was to incorporate water into the reaction mixture along with isocyanate in excess of that needed to react with the polyol. The water and the excess of the isocyanate react to form two products: carbon dioxide gas, which acts as the blowing agent, and amines, which react with excess isocyanate to produce urea linkages,

3. Claim 1 is typical:
   The method of making a polyether-urethane foam which comprises reacting an essentially hydroxyl terminated polyether polyol with an organic polyisocyanate in the presence of from about 2 to 40% by weight based on the total weight of said polyether-urethane forming material of an insert [sic], stable, vaporizable liquid having a boiling point below about 110°C, and being selected from the group consisting of the lower molecular weight alkanes, alkenes and halogen-substituted lower molecular weight alkanes having at least one substituted fluorine atom and at a temperature sufficient to vaporize said liquid and to form a foamed polyether-urethane product.

4. The original Frost application did not discuss the existence of these two methods, but in a subsequently filed application which resulted in the patent here in suit, both methods were explained.

5. Cross linking occurs when the polyurethanes, which are composed of units joined end-to-end, also contain linkages at points between their ends. For example, if a molecule were linear in shape, no cross linking would be present, but if the molecule were step-ladder-shaped, then it would be said to contain cross links.

which act as cross linking agents. Apparently, this technique had certain disadvantages. One is that isocyanate is expensive. Further, in the preparation of flexible foams, the urea linkages make the product foam stiffer than desired.

Frost discovered that certain inert volatile materials would vaporize under the reaction conditions and overcome the disadvantages associated with the *in situ* production of carbon dioxide. Not all gas producing agents, however, were acceptable. Many materials cause the expansion of the foam before the polyurethane product has developed sufficiently to contain the gas. The gas will thus escape and cause a crust to form on the surface of the foam. Other agents produce commercially unacceptable foams because the foams shrink after the initial rise and, eventually, may even collapse.

The blowing agents of the Frost invention, which included the lower molecular weight alkanes and alkenes, halogen-substituted lower molecular weight alkanes, particularly certain halogen-substituted alkanes containing at least one atom of fluorine (a halogen) known by their tradename as "freons", and the lower molecular weight dialkyl ethers, avoided these problems.[6] The boiling points of the Frost agents and the solubility of the agents in the reaction mixture were such that they did not vaporize until the polyurethane had formed to the extent needed to trap the gas.

## HISTORY OF THE FROST PATENT

The route to obtain the patent in suit began on October 20, 1955, when Charles B. Frost filed an application (Serial Number 541,823) (the 823 or parent application) in the Patent Office describing and claiming a method of making polyurethane foams utilizing as blowing agents halogen-substituted alkanes.[7] This application disclosed both polyester and polyether polyurethane foams [8] in either rigid or flexible form. The working examples in the specification included water as part of the reaction mixture, although water was not specifically mentioned in any of the claims. The application, however, did imply that an excess of isocyanate could be present,[9] apparently to provide enough isocyanate to react with water and form carbon dioxide which would aid in the blowing of the foam. In other words, carbon dioxide could act as an "auxiliary blowing agent".

This application met resistance in the Patent Office and on July 31, 1956, all the claims were rejected by the patent examiner as unpatentable over a combination of references. The claims were also rejected for numerous problems of form. For the purposes of this suit, the contents of this rejection and the response by the patent attorney prosecuting the case are not important. The same is true of the second rejection by the patent examiner on June 19, 1957, and the subsequent response by the applicant's attorney.

On June 24, 1958, the patent examiner again considered the claims in the application and for the third time rejected all of them. (DX–2 at 72–74). For the first time the examiner cited German Patent-schrift No. 860,109 to Dr. August Hochtlen (DX–5, hereinafter cited as Hochtlen). Hochtlen described a method for making synthetic sponges.

6. The enumerated agents are not all covered by the claims of the patent in suit, but these agents were at various times urged by General to be part of the Frost invention.

7. This application and its progeny were assigned to General and were prosecuted by General's patent counsel. Some of the work was done by house counsel, and other phases were done by an outside law firm.

8. Polyester polyurethanes are made from polyester polyols whereas polyether polyurethanes are made from polyether polyols. (T–26).

9. For example, claim 3 (DX–2 at 18), indicated that the molar ratio of isocyanate to polyol should be "*at least* about one-to-one". (emphasis added).

In one of the examples (example 3), Hochtlen made a polyester urethane foam by reacting the reaction product of adipic acid and trimethylolpropane, i. e., a polyester polyol, (T–26), with an isocyanate. In this example, Hochtlen used methylene chloride ($CH_2Cl_2$, a halogen-substituted alkane) as a blowing agent.

The claims of the 823 application encompassed processes employing only those halogen-substituted alkanes which boiled at from –60° to +80°F. Although the methylene chloride disclosed in Hochtlen has a boiling point of 104°F., which was outside of the range being claimed, the examiner nonetheless rejected all of the claims over Hochtlen. Further, the examiner rejected those claims directed to specific blowing agents by stating that nothing "critical or patentable" was seen in their use. (DX–2 at 72). The examiner also found the claims to be unduly vague and rejected them on that ground. Further, the examiner stated:

> The claims appear to be incomplete in that the use of water is not recited which is necessary to cause foaming. (DX–2 at 73).

On July 17, 1958, approximately three weeks after this rejection, the examiner had an interview with applicant's attorney, Mr. TeGrotenhuis. (T–551). This interview is not a part of the file history but is referred to by Mr. Heberling, Mr. TeGrotenhuis' associate, in a written response to the examiner's action, dated July 23, 1958:[10]

> At the interview, it was appointed out that methylene chloride (See Hochtlen, et al.) has a boiling point

above 100° F. and that this boiling point differs materially from the preferred range of –60°F. to +50°F. disclosed in the present application. It was apparently felt that affidavits would be useful to establish the criticality of the limitations in the claims, but the Examiner did not think it was necessary to supply the affidavits at this time.

.    .    .    .    .    .

It was pointed out that the use of water in the making of polyurethane sponges is conventional and, prior to the present invention, was considered essential to produce the desired blowing, but that the method of the present invention provides the desired type of sponge without requiring the use of water. Pertinent portions of the specifications were referred to to support the argument that water is not necessary. The Examiner seemed to see the point but apparently would like some type of proof in the form of affidavits. (An affidavit showing that water is not necessary will be submitted if deemed necessary). (DX–2 at 79–80).

The applicant then proceeded to argue that "the boiling point [of methylene chloride] . . . is much too high for the outstanding results obtained by applicant". (DX–2 at 81). General argued further that

> benefits of the present invention are provided when liquified gases (such as monofluorotrichloromethane) boiling up to as high as 80°F. are used. When the boiling point of the liquified gas is beyond that temperature,

10. This interview, or perhaps another interview which occurred shortly thereafter, was referred to by Mr. TeGrotenhuis in a letter which he wrote on September 8, 1958 to Mr. Frank J. Earnheart, General's in-house counsel. In that letter, Mr. TeGrotenhuis stated:

"At the time of the interview, I pointed out to the Examiner that we of course were not aware of this patent [the Hochtlen patent] . . . .." (DX–25).

In fact, the Hochtlen patent had been brought to General's attention by the German patent office in mid-1957 when it was cited as a reference against the German equivalent of the Frost application. TeGrotenhuis now acknowledges that he "probably heard of it at that time", (T–544), and from the correspondence which the Te-Grotenhuis firm had with its German associates, (DX–17 and DX–20), it seems clear that General considered the Hochtlen patent a relevant reference.

the vaporization of the liquified gas and the change of the liquid polyurethane to a solid polyurethane are timed too poorly to produce useful sponges. . . . (DX–2 at 81).

In sum, General attempted to distinguish the blowing agents of the Frost invention from the methylene chloride of Hochtlen on the basis of the fact that the blowing agents of the then pending application had lower boiling points than the methylene chloride disclosed in Hochtlen.

With respect to the necessity of water, the applicant again pointed out that

useful polyurethane foams, both rigid, and flexible, may be prepared without using any water. However, water is generally present (even if in very small amounts, say 0.1% by weight) in commercially available polyesters and polyalkylene ether glycols. (DX–2 at 83).

In his response to these arguments, which appear in an action dated May 4, 1959, the examiner again rejected the claims as unpatentable over Hochtlen. The examiner stated:

Since the patent [Hochtlen] uses a halogenated hydrocarbon [methylene chloride] and applicant uses the same, it is not seen wherein the difference in boiling points is critical or patentable. Mere assertions as to superior or unpredictable results are of no weight in the absence of proper corroborating evidence. (DX–2 at 85).

This statement by the examiner was thus an invitation to the applicant to submit affidavits showing the superiority of foaming agents having the lower range of boiling points.

In this action, the examiner also cited for the first time Belgium patent 519,547 (the Wingfoot Patent, DX–6). Wingfoot disclosed the use of any of five agents—acetone, ethyl acetate, methyl acetate, carbon tetrachloride (a halogenated hydrocarbon) and isopropyl ether (a dialkyl ether)—in the preparation of polyester urethane foams.

Wingfoot refers to these agents as "viscosity reducers", but the examiner apparently felt that when the agents were present they would inherently function as blowing agents. The halogenated hydrocarbon which Wingfoot disclosed (carbon tetrachloride) boils at a higher temperature than the Frost agents, but the examiner stated that this was "of no moment" and "[i]t would appear that the difference in results, if any, would be one of degree only which is not of patentable distinction." (DX–2 at 84).

Finally, the examiner maintained his position that water be included in the claim since

In view of the fact that water is used in all the examples, it is deemed to be an integral part of the invention and should be expressly set forth in the claims. There is no express statement in the specification that foaming occurs under anhydrous conditions. (DX–2 at 85–86).

The applicant never responded to this Patent Office action, but instead filed a continuation-in-part application (a CIP), which will be discussed later. To preserve the sense of chronology, it is important to digress for a moment, however, to review some experiments which were performed at General during this time.

On September 8, 1958, Mr. Theodore TeGrotenhuis wrote to Mr. Frank Earnheart, in-house patent counsel, regarding the prosecution of this application:

The main reference in the above-identified case is the Bayer German Patent 860,109 [Hochtlen] which describes the production of foam from . . . methylene chloride. . . . The reference also states that easily-volatile solvents which do not react with isocyanate may be used in a suitable way through the use of heat or vacuum.

At the time of the interview, I pointed out to the Examiner that we of course were not aware of this patent and that methylene chloride boiled

at 105°F., whereas we found it necessary to use solvents which boil below 80°F.

I pointed out that the material had great possibility for use in refrigerator insulation. The Examiner stated that he was aware there was quite a lot of exothermic heat which of course would be quite readily dissipated in a thin section, so that perhaps methylene chloride would not provide sufficient blowing. However, he insists on a comparative test on the use of methylene chloride and one of the Freons boiling below 80° in a water-free mixture.

I have taken this matter up with George Gmitter and he is going to follow through and provide data. If methylene chloride does not function well, we can expect this application to be allowed quite promptly, according to the Examiner. If it does function well, he is likely to consider it an equivalent. (DX–25).

Shortly after writing this letter, Mr. TeGrotenhuis conferred directly with Dr. Gmitter, who was Section Head of Condensation Polymers for General. (T–619–20, 630–33). Pursuant to this conversation, Dr. Gmitter directed one of his subordinates, Dr. Louis Nicholas, to conduct a series of experiments to determine the relative merits of a number of blowing agents, including the methylene chloride of Hochtlen and the various agents disclosed by Wingfoot. These experiments involved both rigid polyether and rigid polyester urethane foams and were performed without water in the reaction mixture. The results were reported by Dr. Nicholas on February 17, 1959, in a report entitled "The Use of Solvents to Blow Rigid Foams". (DX–38).

The Nicholas' report indicated, among other things, that certain freons, including freon 113 (Boiling point 118°F.),

which fell outside the scope of claims in the then pending application, were satisfactory for blowing rigid foams in the absence of water when either polyethers or polyesters were used.

This was a further confirmation of what General had suspected, (DX–28), namely, that it could not distinguish its blowing agents from the methylene chloride of Hochtlen on the basis of boiling points. The Nicholas report also indicated, however, that a rigid polyether foam made in the absence of water using methylene chloride as a blowing agent "shrinks badly", (DX–38, Table I), and a polyester foam also made in the absence of water using methylene chloride as a blowing agent, had "coarse cells: no shrinkage". (DX–38, Table II). The Wingfoot agents which Nicholas tested showed scattered results, some functioning better than others, but none functioning as well as the best freons.[11] For polyether foams blown with the Wingfoot agents acetone or ethyl acetate, the result reported by Nicholas was "Shrinks Badly"; for the Wingfoot agent carbon tetrachloride, the result was "Decomposed; Brown; Creviced"; and for the Wingfoot agent isopropyl ether, the result was "Good Cell Structure; Slight Shrinkage". (DX–38, Table I).

On October 28, 1958, less than two months after Mr. TeGrotenhuis had contracted Mr. Earnheart and Mr. Gmitter, Mr. Heberling wrote to Mr. Gmitter regarding further tests to be performed in connection with the prospective filing of CIP applications on the invention. The first request of Mr. Heberling was for:

Tests showing whether or not methylene chloride works in flexible polyether urethane foam and also rigid and flexible polyester urethane foams.

In connection with German patent 860,109, we have demonstrated that

---

11. One of the freons which Nicholas tested, Freon 112, gave unsatisfactory results ("decomposed brown; creviced"), (DX–38, Table I). The claims of the ultimately issued 582 patent did, however, embrace processes utilizing this freon, and the results of this test were never given to the Patent Office.

methylene chloride blows rigid polyether urethane foam but that the resultant foam shrinks and warps. [This was an apparent reference to the on-going work of Nicholas, (T–568)]. We do not know whether or not it will work in polyester foam— rigid or flexible. While it may be too polar for the polyether, it may be good in the polyester foam. (DX–28). Mr. Heberling's other requests included a request that tests be performed on the blowing abilities of Wingfoot agents.[12] Mr. Heberling also indicated his view that after the results of these tests were known and it was known which agents were operable, separate continuation-in-part applications should be filed on polyester and polyether polyurethane foams.

Subsequently, Mr. Gmitter assigned Mr. Emery Braidich to conduct a series of experiments to provide the portion of the requested data involving flexible foams. (T–640). The work on rigid foams had apparently already been assigned to Dr. Nicholas.[13]

Braidich performed a series of tests, making flexible urethane foams from both polyesters and polyethers. The various blowing agents he employed included those in which Mr. Heberling had expressed interest. Braidich made the foams from so-called "standard formulations" and added a small amount of water to the reaction mixture. The apparent reason why water was added was because, at that time, standard formulations required some water in order to make the most desirable flexible foams. (T–640–42).

Braidich's work is reported in a letter to Mr. Heberling on December 30, 1958. (DX–34). Rather than giving a short subjective evaluation of the various foams that he had made (as had Nicholas), Braidich reported numerical values

for certain of the physical properties of the foams. The measured properties, however, gave results for both methylene chloride and the Wingfoot agents which fell within an acceptable range for commercial foams. (T–961). Apparently relying in part on Braidich's work, TeGrotenhuis wrote on January 20, 1959, and February 3, 1959, to General's English and Dutch patent counsel, respectively, (DX–35 and 36), indicating that, for blowing flexible foams, those prior art agents tested by Braidich would work.

The above described work by Braidich had been done using prepolymers, i. e., using the two step process. Braidich also performed some tests using the so-called "one-shot" method, but all of the tests which Braidich ran using this method resulted in shrinkage, regardless of which blowing agents were used. (DX–36). This, however, was not surprising for the one-shot method was in its infancy at this time. (T–648).

The portion of Braidich's work showing that methylene chloride would blow a flexible polyether urethane foam was a corroboration of work performed earlier in February and March, 1958, by Van Wagenen, also of General. (T–276–289). Van Wagenen's work was referred to in correspondence sent to General's patent department on July 21, 1958, (DX–23), that included the statement, "These liquids ['low boiling liquids such as methylene chloride'] can be readily mixed . . . and good foams are produced."

The work of Nicholas, Braidich, and Van Wagenen was completed and reported prior to May 4, 1959, the date on which the patent examiner rejected all the claims in the parent application for the fourth time. As mentioned previously, General's patent attorneys did

12. This was, of course, prior to the examiner's first citation of the Wingfoot reference. General, however, was aware of the French patent which corresponded to the ultimately cited Belgium patent. (DX–28). Hence, General's interest in the Wingfoot agents.

13. The record is not clear on the question of when Dr. Nicholas was assigned his work, and to what extent this predated Mr. Braidich's assignment. The exact sequence here is not, however, deemed to be of particular significance.

not respond to this rejection but, instead, filed two CIP applications, one on polyester urethane foams and the other, which is in issue here, on polyether foams. The polyether application, which matured into the patent in suit, was filed on April 1, 1959, and assigned Serial Number 803,381.

The blowing agents described and initially claimed in the polyether CIP included halogenated hydrocarbons boiling below 110°C. (230°F.), as well as alkanes, alkenes, and the lower molecular weight dialkyl ethers. Thus, General had expanded the scope of the claims and was now seeking claims embracing some of the agents disclosed by Hochtlen and Wingfoot.[14] Those two references had dealt with processes employing polyesters, however, and contained no teaching regarding the polyethers to which the CIP was directed. The new application specifically noted that water was not required for the claimed process. None of the examples in the specification used water and once again water was not explicitly included or excluded by the claims.[15] The application was directed to foams ranging from rigid through semi-rigid to flexible. Although many of the claims were limited to rigid foams, other specifically included "rigid to flexible" and still others tacitly included polyether foams of any rigidity. The specific examples, however, only demonstrated the preparation of rigid foams.

On January 15, 1960, in his first action on the CIP, the patent examiner rejected all the claims as unpatentable over a combination of references including Hochtlen and Wingfoot.

Hochtlen (ex. 3) discloses the use of methylene chloride as a blowing agent in the preparation of foamed polyester-urethanes. Wingfoot (page 2, lines 35–39), discloses the use of dialkyl ethers, halogenated alkanes, etc. as blowing agents in the preparation of foamed polyester-urethanes.

It would not involve invention to employ the above blowing agents of either Hochtlen or Wingfoot in preparation of foamed polyether-urethanes . . . . since the polyester-urethanes and polyether-urethanes are considered as equivalent as taught by Bender et al. (DX–3 at 30–31).

Among other formal problems, the examiner continued to reject the claims as too broad, because they did not specifically include water "which appears necessary for proper foam formulation." (DX–3 at 32).

In response to this action, (DX–3 at 36–49), General was precluded from making the distinction which had been urged in the prosecution of the parent. Because General now claimed blowing agents with boiling points higher than methylene chloride, it was no longer possible to distinguish the claimed blowing agents from the art of record on the basis of allegedly superior results attributed to lower boiling points. Instead, the applicant adopted the position that while the Hochtlen patent taught the use of methylene chloride as a blowing agent for foams made from polyesters, methylene chloride was "unsatisfactory" for making foams from polyethers. (DX–3 at 39). This was, in effect, an argument that polyether-urethanes and polyester-urethanes were not equivalents, as

14. The Hochtlen agent methylene chloride and the Wingfoot agent carbon tetrachloride were both embraced by the claim language "halogenated hydrocarbon", and the Wingfoot agent isopropyl ether was embraced by the claim language "dialkyl ether". It is noteworthy that isopropyl ether, which General explicitly stated would function acceptably, (DX–3 at 7), became a "Frost agent"

only after General had seen it disclosed in the Wingfoot reference. See, note 12 supra.

15. Several of the claims included an "excess of isocyanate groups". Presumably the function of these excess groups would be to react with water to form carbon dioxide to be a blowing agent. Claims 4 through 7 in the issued patent described a reaction mixture containing "a small amount of water".

the examiner, based on the Bender reference, had supposed them to be. In support of this position, the applicant referred to an example, (DX–3 at 19), in the specification which employed methylene chloride as a blowing agent and gave as a result "shrinks badly". The applicant then urged that "where the blowing agents of the reference are unsatisfactory, it is deemed that the reference is not pertinent and should be withdrawn",[16] (DX–3 at 40), and further stated that

> where no real equivalency has been shown between polyethers and polyesters, where the alleged showing as to equivalency provides unsatisfactory results as to polyether urethanes, where many of the prior art blowing agents are unsatisfactory . . . . it is respectfully submitted that the rejection on the combination of references is unjustified. (DX–3 at 43).

Wingfoot was similarly dismissed as containing a disclosure limited to polyesters; whereas General's claims encompassed only polyethers. (DX–3 at 40). In support of this position, applicant, referring to examples in the specification which employed acetone and ethyl acetate as blowing agents and gave as results "shrinks badly", stated that "acetone and ethyl acetate, noted by Wingfoot as being useful, were not satisfactory in polyether urethanes". (DX–3 at 41.).[17]

General also urged that the Wingfoot teaching was inapplicable since it taught the use of the claimed agents as viscosity decreasers and not as blowing agents.[18] Finally, with regard to the formal rejection, the applicant stated:

> While water may also be used in conjunction with the particular liquefied gases of the present invention, it is not always necessary. In fact, an object of this invention is to avoid the necessity of using water. However, small amounts of water can be used . . . . Hence, the claims are not incomplete as alleged by the Examiner. (DX–3 at 48).

In the next office action, dated September 22, 1960, the examiner countered these arguments of the applicant by repeating the Hochtlen and Wingfoot rejections. The examiner explained this rejection by stating:

> Mere assertions as that the methylene chloride of Hochtlen is unsatisfactory are of no moment unless supported by proper corroborating evidence. The comparative tests in the specification cannot be given any weight since they are not under oath. Further, the showing is considered not a proper comparison with applicant's solvents since different amounts and prepolymers having different viscosities were used." (DX–3 at 51).

This was an invitation for the applicant to submit affidavits supporting the posi-

---

16. It appears somewhat anomolous that General was discrediting the efficiency of an agent which fell within the scope of the claims then before the Patent Office, for if methylene chloride were unsatisfactory, yet within the scope of the claims, the claims could be deemed unduly broad. Such, however, is not necessarily the case. See e. g., In re Dinh-Nguyen, 492 F.2d 856, 858–59 (C.C.P.A.1974), ("It is not a function of the *claims* to specifically exclude either possible inoperative substances or ineffective reactant proportions".) (emphasis original).

17. General could not argue that none of the Wingfoot agents was satisfactory in polyether formulations, for at this time General was claiming dialkyl ethers, (DX–3 at 38), and, as has been noted *supra*, the specifica-

tion explicitly listed isopropyl ether (a Wingfoot agent) as an example of a material which could be used.

18. In the parent, one of the objects of the Frost invention was stated as follows: "It is a still further object of this invention to provide a method for producing cellular polyurethanes wherein more viscous and therefore higher molecular weight polyesters then those formerly suitable can be used." (DX–2 at 4). This appears to be an acknowledgement that the Frost agents acted as viscosity reducers. This object of the invention was not, however, repeated in the CIP, perhaps because General felt that the examiner would rely on that language to show the appropriateness of the Wingfoot reference.

tion that methylene chloride was unsatisfactory. (T–916).

With respect to the Wingfoot reference, the examiner adhered to his position:

The fact that Wingfoot does not spell out that the volatile solvent functions as a blowing agent does not negative the rejection. It is obvious, that the volatile solvents of Wingfoot would volatilize during the exothermic foaming reaction. It is immaterial that some of the solvents of Wingfoot may not yield the desired results since it would be a mere matter of routine experimentation and determination for one skilled in the art to separate the desired solvents from the undesired solvents. (DX–3 at 51).

In further response to applicant's contention that some of the Wingfoot agents gave unsatisfactory results, the examiner stated "the showing in the specification [of unsatisfactory results in tests using certain of the agents disclosed in Wingfoot] is not convincing for the reasons set forth above [the tests in the specification were not under oath]." (DX–3 at 51). For the first time the examiner did not include in the rejection a requirement that the claims specifically recite the presence of water.[19]

In its response to this office action, the applicant sharply restricted the scope of the claims, including now only the lower molecular weight alkanes, alkenes and halogenated alkanes having at least one substituted fluorine atom (the freons). Thus, the claims no longer encompassed the methylene chloride of Hochtlen or the dialkyl ethers of Wingfoot. Applicant now stated, "None of the claims as now presented include any of the substances recited in either Wingfoot or Hochtlen and therefore discussion of this art is believed unnecessary." (DX–3 at 60).

Nevertheless, the applicant went on to state:

(For record purposes, however, applicant's attorney must take issue with the Office position as expressed in the last full paragraph of page 1 of the Official Action of September 22, 1960 and the second full paragraph of page 2 of this Official Action, that the technology, including reactants, catalysts, crosslinkers, blowing agents, etc., of *either* the polyester or the polyether system of producing polyurethane foams can be interchanged with the other system. It is believed, that, in fact, interchangeability of these two systems is the exception rather than the rule. Accordingly, it is submitted for record purposes that any teachings in connection with the polyester system such as the Hochtlen patent would not be validly suggestive in connection with a polyether system). (DX–3 at 60).

The applicant referred to the agents now being claimed as "superior", (DX–3 at 59), and claimed to have shown their "superiority", (DX–3 at 65), as compared to the prior art.

This response by the applicant concluded with an affidavit by Dr. Nicholas which stated that the agents being claimed gave results "markedly superior", (DX–3 at 67), to those obtained using any of the agents disclosed in the prior art patents. Dr. Nicholas also attested to the results contained in two of the three examples in the specification. Many of these tests in the CIP to which Nicholas was now attesting had been included in the February, 1959 report which Nicholas had prepared. The affidavit also contained the results of some tests not shown in the specification. Some of these tests were slight variations of those in the specification, done in order to conform to the examiner's objection that the examples were not a

19. Testimony at trial indicated, however, that in the manufacture of flexible foams water is always used in the commercial processes. (T–278, 548, 715, 964, 985).

fair comparison since different materials and quantities were used. The Nicholas affidavit also contained an explanation of the test results. This explanation included a statement that the alkanes and freons, which were then being claimed, "are efficacious blowing agents which cause desirable expansion without contemporaneous or subsequent shrinkage", (DX–3 at 68), whereas the other agents caused "shrinkage which is a very serious factor in considering commercial sized foaming operations." (DX–3 at 68). The agents causing such shrinkage included methylene chloride and various of the Wingfoot agents. Included in the list of agents causing the serious shrinkage were the ethers which the CIP had initially claimed. Accompanying the affidavit were photographs of various foam specimens. The explanation of these photographs noted that the photograph of the sample blown with methylene chloride demonstrated "extreme shrinkage", and samples blown with the Wingfoot agents acetone and ethyl acetate also demonstrated "extreme shrinkage". (DX–3 at 71). The Wingfoot agent, isopropyl ether, showed "considerable shrinkage", (DX–3 at 72), and it was stated that none of the photographed specimens, other than those specimens blown with the agents then being claimed, "would be satisfactory as a commercial foam because [of] the shrinkage evidenced. . . ." (DX–3 at 72).

Immediately following this conclusion in the affidavit, Dr. Nicholas indicated that the formulation and foaming procedure used in the tests was a:

> conventional and normal one for the laboratory preparation of polyether type polyurethane foams except that no water was added thereby avoiding

the formation of carbon dioxide which would detract from the comparison through dilution of the gases formed. (DX–3 at 72).

For formal reasons, the amendment restricting the scope of the claims was not entered immediately. (DX–3 at 96). Two similar amendments were, however, submitted on June 5, 1961, and these later amendments were entered.

Shortly thereafter, the examiner allowed the process claims, but continued to reject the product claims. (DX–3 at 164). This rejection was, however, not based on either the Hochtlen or Wingfoot reference. The product claims were allowed after the Patent Office Board of Appeals overruled this rejection. (DX–3 at 189–91).[20]

The defendants contend that General was guilty of fraud on the Patent Office or of inequitable conduct. This contention is based on the allegation that General misrepresented the ability of certain of the agents disclosed by Hochtlen and Wingfoot to function as blowing agents in producing polyether urethane foams.

Prior to considering this allegation, however, this Court must first determine the applicable standards by which General's conduct is to be judged.

## THE LAW OF THE FRAUD DEFENSE

Although earlier cases established a rule that fraud in procurement was no defense to an infringement suit,[21] starting with Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933), courts hearing patent infringement suits have, as courts of equity, refused aid to the patentee with unclean hands.[22] The

---

20. The action by the Board of Appeals resulted from the examiner having cited "no reference to the use of foaming agents other than carbon dioxide . . . ." (DX–3 at 190). Hence, the examiner's withdrawal of the Hochtlen and Wingfoot references appears to have had a decisive impact on the Board of Appeals.

21. See, e. g., Rubber Co. v. Goodyear Co., 76 U.S. (9 Wall.) 788, 19 L.Ed. 566 (1870); Railroad Co. v. Dubois, 79 U.S. (12 Wall.) 47, 20 L.Ed. 265 (1870); and Mowry v. Whitney, 81 U.S. (14 Wall.) 434, 20 L.Ed. 858 (1871).

22. Corona Cord Tire Co. v. Dovan Chem. Corp., 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed.

early cases recognizing unclean hands as a defense to an infringement suit generally dealt with situations in which the patentee was found to have perpetrated a fraud upon a court. *See, e. g.,* Keystone Driller, supra, and Hazel-Atlas Glass ·Co. v. Hartford-Empire, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944). Ever since Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) (Precision Instrument), however, fraud in procurement has been solidly established as a defense to an infringement suit.[23] Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965) (Walker), the most recent Supreme Court decision dealing with fraud on the Patent Office, was concerned not with an infringement action, but rather with "whether the maintenance and enforcement of a patent obtained by fraud on the Patent Office may be the basis of an action under § 2 of the Sherman Act." 382 U.S. 173, 86 S.Ct. 348. Much of the discussion in Walker is nevertheless pertinent to an inquiry into the propriety of a fraud defense to an infringement suit.

■ Since Walker, fraud defenses in patent suits have been asserted with increasing frequency and the myriad of decisions in which a fraud defense prevailed are not easily reconciled or subject to simple classification. There appears to be general agreement, however, that in order for a fraud defense to succeed at least two things must be shown. First, an element of willful, wrongful conduct or wrongful intent before the Patent Office must be shown; second, depending on the court, the wrongful conduct or intent must have either attempted to impair, or actually to have impaired the Patent Office's ability to perform its statutory function, i. e., to have been "material" or "relevant". Beyond this general statement, however, it is difficult to formulate rules delineating the sort of conduct which will form the basis for a fraud defense. Part of this difficulty stems from the equitable nature of the defense. In Precision Instrument, the Court noted that the "maxim [he who comes into equity must come with clean hands] necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. It is 'not bound by formula or restrained by any limitation that tends

610 (1928), five years prior to Keystone Driller, seems to have assumed that false affidavits submitted to the Patent Office in the course of a patent's prosecution would, if they related to a material fact, result in destruction of "[t]he reasonable presumption of validity". 276 U.S. 374, 48 S.Ct. 380. The notion that fraud in the prosecution would serve to destroy the presumption of validity has recurred at various times. *See, e. g.,* Floridin Co. v. Attapulgus Clay Co., 35 F.Supp. 810 (D.Del.1940), aff'd. on other grounds, 125 F.2d 669 (3rd Cir. 1942). See also, University of Illinois Foundation v. Blonder-Tongue Laboratories, 422 F.2d 769, 777 (7th Cir. 1970), vacated on other grounds, 402 U.S. 313, 91 S.Ct. 1434, 28 L. Ed.2d 788 (1971) (action of patentee, while not rising to level of fraud "detract[s] from the presumption of validity"), and Honeywell, Inc. v. Sperry Rand Corp., 180 U.S.P. Q. 673, 708 (D.Minn.1973) ("even an innocent misrepresentation of facts destroys the presumption of validity").

23. In Dodds, Fraud on the Patent Office, 56 J.P.O.S. 345 (1974), the view is expressed that the Court's decision in Precision Instrument was based on frauds which were beyond the scope of the Patent Office proceedings. In Dodds' view, it was not until the later case of Walker Process v. Food Machinery, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), that the Court finally recognized fraud on the Patent Office as a defense to an infringement suit. Dodds' restrictive interpretation of the earlier cases would, however, appear to be a minority view and certainly many lower courts were recognizing the defense of fraud on the Patent Office long before the *Walker* Court held that fraud on the Patent Office could form the basis for an anti-trust claim. See, Hamburg, Patent Fraud and Inequitable Conduct §§ 1.02 and 3.02 (Clark Boardman Co., 1974), for a discussion of the development of judicial remedies for fraud. *See, also,* Cullen and Vickers, Fraud In the Procurement of a Patent, 29 Geo.Wash.L.Rev. 110 (1960).

to trammel the free and just exercise of discretion.'" 324 U.S. 815, 65 S.Ct. 997. Hence, part of the apparent irreconcilability of the various decisions may be laid to judicial discretion which distinguished particular conduct based on the facts in a given case.[24]

A factor which has perhaps made the fraud defense more complex than it would otherwise be has been the attempts by many courts to distinguish between fraud which will invalidate [25] and less reprehensible conduct which is labeled unclean hands and will result in the patent in suit being found unenforceable. For example, in Corning Glass Works v. Anchor Hocking Glass Corp., 253 F.Supp. 461 (D.Del.1966), modified, 374 F.2d 473 (3rd Cir.), cert. denied, 389 U.S. 826, 88 S.Ct. 65, 19 L. Ed.2d 80 (1967) (Corning), which was decided shortly after Walker, this Court recognized three levels of fraud: one which would invalidate; one which would result in unenforceability; and one which was harmless and thus had no adverse consequences.[26] Discussions by other courts referring to varying levels of fraud, some levels justifying invalidity holdings and some levels justifying a refusal to enforce, abound. See, e. g., Honeywell, Inc. v. Sperry Rand Corp., 180 U.S.P.Q. 673, 711 (D.Minn.1973)

("a line between intentional fraud which will invalidate a patent and inequitable conduct which will render it unenforceable"); American Optical Corp. v. United States, 179 U.S.P.Q. 682, 684 (Ct.Cl. 1973) ("a patent involved in litigation may be declared unenforceable, as opposed to invalid, even without a complete showing of fraud. . . ."); SCM Corp. v. Radio Corp. of America, 318 F. Supp. 433, 449 (S.D.N.Y.1970) (RCA) ("The line between fraud which will invalidate a patent and 'unclean hands' which will bar its enforcement is a shadowy one").

■ This Court reads the latest opinions of this Circuit, Monsanto Co. v. Rohm & Haas Co., 456 F.2d 592, cert. denied, 407 U.S. 934, 92 S.Ct. 2463, 32 L.Ed.2d 817 (1972) (Monsanto), and Trio Process Corp. v. L. Goldstein's Son's, Inc., 461 F.2d 66, cert. denied, 409 U.S. 997, 93 S.Ct. 319, 34 L. Ed.2d 262 (1972) (Trio Process), as eliminating any distinction between unclean hands leading to unenforceability and fraud leading to invalidity, for as this Court reads those decisions all proscribed conduct should result in an invalidity decree. Elimination of the distinction was not unreasonable,[27] for to date it has been of little practical consequence to the parties in infringement

---

24. But see, e. g., Monsanto Co. v. Dawson Chem. Co., 312 F.Supp. 452 (S.D.Tex.1970), rev'd. on other grounds, 443 F.2d 1035 (5th Cir. 1971), cert. denied, 405 U.S. 974, 92 S. Ct. 1191, 31 L.Ed.2d 248 (1972), and Monsanto Co. v. Rohm & Haas Co., 312 F.Supp. 778 (E.D.Pa.1970), aff'd., 456 F.2d 592 (3rd Cir.), cert. denied, 407 U.S. 934, 92 S.Ct. 2463, 32 L.Ed.2d 817 (1972), for cases in which different courts took divergent views of the same conduct.

25. Some commentators have pointedly argued that in an action brought by private parties, a court may find a patent unenforceable, but it is not empowered to hold a patent *invalid*. See, e. g., Pat.L.Persp. § G.1[2]–5 (1969–70A/R). Although a logical case can be developed for this position, a close analysis of Supreme Court dicta in both Walker and Blonder-Tongue, Inc. v. University of Illinois Foundation, 402 U.S. 313, 344 n. 41, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), does not com-

pel such a view. Cf., Hamburg, Patent Fraud and Inequitable Conduct § 4.01[3][c] (Clark Boardman Co. 1974). Under Monsanto Co. v. Rohm & Haas Co., 456 F.2d 592 (3rd Cir.) cert. denied, 407 U.S. 934, 92 S.Ct. 2463, 32 L.Ed.2d 817 (1972), which is the law of this Circuit, invalidity decrees are permissible remedies for fraud. This *Monsanto* view has, despite the criticism of some commentators, been widely followed. See, e. g., Beckman Instruments, Inc. v. Chemtronics, Inc., 428 F.2d 555 (5th Cir.), cert. denied, 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264 (1970).

26. This view that there were three possible levels of fraud with varying consequences for each was the subject of a well-reasoned criticism. Stedman, Acquisition of Patents and Know-How By Grant, Fraud, Purchase and Grant-Back, 28 U.Pitt.L.Rev. 161, 176 (1966).

27. Stedman, note 26, *supra.*

suits whether a court ultimately held a patent invalid for fraud or unenforceable for unclean hands. There have been suggestions by commentators [28] that possibly different res judicata effects could flow from the two types of decisions or that, in some instances, unclean hands could be purged, leading to later enforceability of patents previously held unenforceable, but such distinctions have not been articulated in the reported opinions.[29] Perhaps the major reason courts have made this distinction has been because of a reluctance to label as "fraudulent" conduct which may only reflect a lack of candor. See, RCA, 318 F.Supp. 448. To establish a *Walker*-type anti-trust claim, a party must, of course, demonstrate actions by the patentee which amount to fraud, i. e., which match the conduct proscribed in that case by the Supreme Court. Conduct which is somewhat less egregious than that needed to support an anti-trust claim will, however, under Monsanto and Trio Process, warrant a finding of invalidity. Having determined that even conduct constituting unclean hands will serve as grounds for an invalidity decree, it is now incumbent on this Court to determine appropriate standards of materiality and intent by which a patentee is to be judged and to further determine what burden of proof is to be placed on the party asserting fraud.

## A. MATERIALITY

■ Some variation of the so-called "but for" test has appeared in nearly every patent fraud case. In Corning, this Court held that once an invention was judicially determined to be "patentable over the prior art, as a legal proposition, defendants' allegations of fraud must fail". 253 F.Supp. 469. In other words, a finding of fraud is warranted if but for the misconduct of the patent applicant the patent would not properly have issued. This is what has been referred to as an "objective but for test". A clear-cut example of this kind of "but for" fraud was the conduct in Walker, wherein prior public use was concealed. Once the prior use was disclosed, the patent was invalid for failure to meet the requirements of 35 U.S.C. § 102 and any fraud in procurement only compounded such invalidity. Prior to finding this sort of "but for" fraud, a court must, of course, make an independent patentability determination.

The second "but for" test is the so-called "subjective test". This test requires a court to examine the effect which fraudulent representations had upon the examiner. If misrepresentations caused the examiner to issue the patent, then this kind of "but for fraud" will be found. This Court applied the subjective test in Waterman-Bic Pen Corp. v. W. A. Sheaffer Pen Co. 267 F. Supp. 849, 856 (D.Del.1967), and after finding that the misrepresentations (if any) of the patentee "did not impel the Patent Office to issue the patent", 267 F.Supp. 856, the patent was held valid and infringed. The most celebrated example of a subjective "but for" test was that applied in American Cyanamid Co. v. FTC, 363 F.2d 757 (6th Cir. 1966), wherein the court remanded the case to the Commission so that the examiner could testify and it could be determined whether the patent had issued as the result of a deception.

The final "but for" test has been labeled the "but it may have" test, i. e., courts look to whether the misrepresentations made in the course of the patent prosecution may have had an effect on the examiner.

In Corning, this Court, referring to such misrepresentations, observed that

---

28. See, Pat.L.Persp., Note 25, *supra*.

29. In some opinions, e. g., Troxel Manufacturing Co. v. Schwinn Bicycle Co., 465 F.2d 1253 (6th Cir. 1972), there has been a suggestion that in the case of a patent which is found invalid for fraud, licensees would be entitled to a royalty refund. No cases appear to be on point. One can, however, speculate that perhaps if conduct were less egregious and found to lie in a region labeled unclean hands, and not fraud, such a refund would not be deemed appropriate.

one who makes this kind of misrepresentation to a patent examiner deprives the court "of the benefit of the Patent Office's expertise in making the initial finding concerning patentability". 253 F.Supp. 471. In RCA, Judge McLean observed that the leading Supreme Court decisions dealing with the inequitable conduct defense "do not appear to require a finding that the inequitable conduct had a 'but for' effect on the granting of the patent as a prerequisite to a court's refusal to enforce it." 318 F.Supp. 449. Judge McLean then stated:

> No one can tell with certainty what would have happened if RCA had dealt fairly with the Patent Office. But the fact remains that RCA did withhold relevant facts. Which side in this litigation is to suffer from this conduct? It is appropriate that it should be RCA who suffers. Any other rule would fail adequately to discourage conduct of this sort merely because of the circumstance, which must be present in many cases, that it turns out to be impracticable to ascertain what the Examiner, who did not know the true facts, would have done if he had known them. The evidence here justifies the conclusion that this court should not enforce a patent obtained under these circumstances. 318 F.Supp. 449–50.

■ The test articulated by Judge McLean appears to comport fully with the law expressed in Monsanto. Further, Trio Process, which followed Monsanto, viewed Monsanto as speaking to the situation in which "the patent *might* not have issued had full disclosure been made." 461 F.2d 73. (emphasis added) Hence, in this Circuit, a misrepresentation which makes it "impossible for the Patent Office fairly to assess [the] application against the prevailing statutory criteria", Monsanto, 456 F.2d 592, 600, will, given the requisite intent, lead to a finding of invalidity.[30]

## B. INTENT

■ While Monsanto can be read as allowing "innocent" misrepresentation to suffice as grounds for holding a patent invalid, the majority's opinion does not lend itself unequivocally to support of that view.[31] In fact, the majority opinion, in addition to referring to "willful" acts, expressly refers to the unclean hands doctrine as "prevent[ing] a *wrongdoer* from enjoying the fruits of his transgression." 456 F.2d 598, (emhasis added). This Court thus reads Monsanto as sanctioning only willful misrepresentations which contain an element of wrongfulness.[32] In the context of a patent prosecution, it may be difficult, however, to determine what is wrongful. In Mueller Brass Co. v. Reading Industries, Inc., 352 F.Supp. 1357 (E.D.Pa.1972), aff'd., 487 F.2d 1395 (3rd Cir. 1973), (without opin-

---

30. Recent District Court decisions in this Circuit which accept this "but it might have" test include CPC Int'l., Inc. v. Standard Brands, Inc., 385 F.Supp. 1057 (D.Del. 1974), and Fruehauf Corp. v. International Terminal Operating Co., 183 U.S.P.Q. 526, 549 (D.N.J.1973).

31. In Monsanto, the District Court had initially found that certain omissions in Monsanto's representations to the Patent Office were "intentionally and deliberately made to mislead the patent office." 312 F.Supp. 786. Monsanto moved for a partial new trial on the ground that this issue had not been properly before the court. 312 F.Supp. 798. The District Court denied this motion, but went on to state: ". . . even if we were persuaded to change our mind and find that although there were intentional omis-

sions of fact, Monsanto did not intend to mislead the Patent Office, this would not lead us to a different conclusion with respect to the validity of a patent in light of such omissions." 312 F.Supp. 799. While Judge Kalodner, in his dissent, urged that affirmance of this opinion would approve finding invalidity in cases where the misrepresentations were "innocent", 456 F.2d 601, the majority opinion does not express that view. 456 F.2d 601, n. 14.

32. In a leading case on the subject of the intent necessary to establish an unclean hands defense, Xerox Corp. v. Dennison Mfg. Corp., 322 F.Supp. 963 (S.D.N.Y.1971), Judge Mansfield convincingly rejects the notion that negligent material misstatements or negligent nondisclosures are sufficient to form the basis for the defense.

ion), the court noted "Two conflicting principles tear at an attorney practicing before the patent office. One is that the proceeding is not adversary, so the attorney therefore owes a high duty of candor to the examiner. The second is that the attorney has a duty of advocacy to his client." 352 F.Supp. 1379. Further, in reflecting on this conflict, one must bear in mind that arguably higher standards may have developed in the years subsequent to the patent prosecution at issue. See, Diamond International Corp. v. Maryland Fresh Eggs, Inc., 374 F.Supp. 1223, 1248 (D. Md.1974).

In light of these difficulties, Judge McLean's opinion in RCA seems to this Court to strike a reasonable balance. In that case, prior to holding the patent at issue unenforceable, Judge McLean stated "It may be unduly harsh to characterize RCA's conduct here as fraud. . . . But at the least, it was conduct which was lacking in candor. It was intentional nondisclosure of relevant data . . . . 318 F.Supp. 448.

This view of Judge McLean comports with the often-quoted standards set out by the Court of Customs and Patent Appeals in Norton v. Curtis, 433 F.2d 779, 57 CCPA 1384 (1970). In that case, Judge Baldwin discussed extensively the obligations which are incurred by those seeking patents, and the proper standards to use in determining whether those obligations have been met. Judge Baldwin first noted that "traditionally, the concept of 'fraud' has most often been used by the courts, in general, to refer to a type of conduct so reprehensible that it could alone form the basis of an actionable wrong . . . ." 433 F. 2d 792. But then he notes "the term 'fraud' is also commonly used to define that conduct which may be raised as a defense in an action at equity . . . In this context, it is evident that the concept takes on a whole new scope. . . ." 433 F.2d 793. Judge Baldwin observed that "the courts have become more critical in their interpretation of the relationship existing between appli-

cants for patent and the Patent Office," 433 F.2d 793, and that "the ex parte prosecution and examination of a patent application . . . should not be limited to the standards required in inter partes proceedings. . . . The highest standards of honesty and candor on the part of applicants in presenting such facts to the office are thus necessary elements in a working patent system." 433 F.2d 793–94.

Judge Baldwin concludes by stating "Good faith and subjective intent, while they are to be considered, should not *necessarily* be made controlling. Under ordinary circumstances, the *fact* of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there was a fraudulent intent. Where public policy demands a complete and accurate disclosure it may suffice to show nothing more than that the misrepresentations were made in an atmosphere of gross negligence as to their truth." 433 F.2d 795–96 (emphasis original).

The positions of Judges McLean and Baldwin on the intent necessary for the equitable defense of fraud, or unclean hands, appear to this Court to be persuasive, and to accord fully with the "totality of circumstances" approach expressed in Monsanto. 456 F.2d 600.

## C. BURDEN OF PROOF

For the Government to prevail in a suit to cancel a patent on the grounds that it was procured by fraud, the Government's case "must be clear, unequivocal, and convincing . . . it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt. . . ." United States v. Bell Telephone Co., 167 U.S. 224, 241, 17 S.Ct. 809, 811, 42 L.Ed. 144 (1897). Many courts have used similar language in describing the burden placed upon a private party asserting an unclean hands or fraud defense. See, Hamburg, Patent Fraud and Inequitable Conduct § 5.02 (Clark Boardman Co. 1974).

Under Monsanto, a similar rule prevails in this Circuit.[33]

## EVALUATION OF GENERAL'S CONDUCT

Having determined the legal standards by which General's conduct is to be judged, the Court will now proceed to evaluate the allegation made by the defendants.

The defendants' contention that General misrepresented the efficacy of certain of the prior art agents is the subject of a semantic debate. During the prosecution of the CIP application, General represented to the Patent Office that the methylene chloride disclosed by Hochtlen, and that certain of the agents described by Wingfoot were "unsatisfactory" in processes involving polyethers.[34] At this time, there was never, in Te-Grotenhuis' words, "even a question about whether or not methylene chloride would work". (T–573). General knew that methylene chloride could be used for making urethane foams from polyethers under certain conditions, e. g., in flexible foams if water was present, as had been shown by Braidich and Van Wagenen, and as had been reported by General to its British and Dutch patent agents. Hence, General now acknowl-

edges, as well it must, that methylene chloride will work.[35] Further, as the Braidich tests indicated, those Wingfoot agents which were represented to the Patent Office by General as being "unsatisfactory", will work in the case of flexible foams made in processes utilizing added water. General, however, now states that the issue before the examiner was one of superiority—not operability—and that the defendants have not shown that in making foams from polyethers the claimed agents are not superior to methylene chloride and the Wingfoot agents.[36]

It is, of course, true that the word "unsatisfactory" as used by General in the prosecution of the CIP can be construed as merely an attempt to distinguish between varying degrees of operability, and not as an attempt to assert that processes utilizing "unsatisfactory agents", e. g., methylene chloride, are not operable. In the context of this patent's prosecution, however, such a reading of the word "unsatisfactory" appears to this Court to be both strained and unrealistic. During the prosecution of the CIP, General referred to examples showing the result "shrinks badly" when it sought to support its position that methylene chloride and certain of the

33. The dissent in Monsanto expressed the view that the District Court had erred in using only a preponderance of the evidence standard. 456 F.2d 601–02. The majority did not disagree with the dissent's view that "clear and convincing" proof was required. Rather, the majority contended that the District Court had, in fact, used the clear and convincing evidence standard. 456 F.2d 601, n. 14.

34. The Wingfoot agents acetone and ethyl acetate were called unsatisfactory; whereas, the Wingfoot agent isopropyl ether was, at first, claimed as an operative compound.

35. There was testimony that today some commercial processes utilize methylene chloride as a blowing agent. (T–984).

36. General can point to certain representations that it made to the Patent Office in which it used the terms "outstanding", "superior", and "superiority" in reference to the claimed agents. General's use of these terms in the prosecution of the parent appli-

cation, however, was unsupported by any examples. General there claimed superiority of the Frost agents over prior art blowing agents having lower boiling points, a distinction evidently without merit. See p. 1360, *supra.* The examiner evaluating the CIP application, therefore, would have no reason to refer to these terms claiming superiority in assessing General's contention that the Hochtlen and Wingfoot agents were "unsatisfactory".

In the prosecution of the CIP application, these terms connoting superiority were used by the applicant only in response to the final office action and in the accompanying Nicholas affidavit, at a time when the applicant was substantially restricting the scope of the pending claims. This Court concludes that, in such context, the terms may have implied that certain operative agents were being excluded from the claims, but did not imply that agents specifically exemplified as causing "extreme shrinkage" would ever be operable.

Wingfoot agents were "unsatisfactory". The initial inference to be drawn from General's presentation, accordingly, was that those agents were "unsatisfactory" because they would not work. Further, the examples in the Nicholas affidavit showed that methylene chloride and the Wingfoot agents acetone, ethyl acetate, and isopropyl ether gave "extreme shrinkage" that was a "very serious factor" and would have been commercially unsatisfactory.

■ General did not disclose any examples of flexible foams made from polyethers with water present, wherein the difference between methylene chloride and the claimed agents would have been only a matter of degree.[37] General contends that it did not show examples of such processes because it was only interested in showing a comparison of blowing agents and, if water had been present, due to production of carbon dioxide, a less satisfactory comparison between blowing agents would have been achieved, i. e., the water would have had a "masking effect". This may well be true, and if the examiner had known, as did General, that methylene chloride was suitable for making foams from polyethers under other conditions, the Nicholas data would not have been deceptive.

The examiner, however, did not know and had no way of discerning from statements made to him by General that methylene chloride ever gave satisfactory results in processes employing polyethers. The Hochtlen reference upon which he relied only taught that methylene chloride gave satisfactory results in processes involving polyesters. Thus, in the context of the CIP prosecution, wherein General continually referred to methylene chloride as "unsatisfactory", it was clearly deceptive for General, knowing of operative polyether examples using methylene chloride, to supply the examiner only with examples wherein methylene chloride gave inoperative results. If the examiner had known methylene chloride is operative in processes using both polyethers and polyesters, his position that processes using polyesters are analogous to processes using polyethers would have been strengthened, and he might have continued to assert Hochtlen as a reference against processes utilizing polyethers.[38]

The fact that the examiner was at one time told that one of the Wingfoot agents, isopropyl ether, was operable as a blowing agent for polyether foams might be deemed an ameliorative circumstance.[39] The fact that one prior

---

37. The defendants contend that those foams made using methylene chloride were just as good as foams made using freons. General disagrees. It is not necessary for this Court to settle that dispute since the alleged superiority of foams made from freons is not the controlling issue.

38. Since the claims were narrowed to exclude methylene chloride, it is entirely possible that the examiner would have dropped the Hochtlen reference even if successful use of methylene chloride had been disclosed. It is also possible, however, that the examiner would have felt that substitution of the claimed freons, alkanes and alkenes for methylene chloride would have been obvious to one of ordinary skill in the art; accordingly, he would have continued to reject the claims as unpatentable over Hochtlen.

General also contends that it was simply disclosing to the examiner data which the examiner had requested. In support of this position, General points to the Te-

Grotenhuis letter of September 8, 1958, (DX–25), wherein Mr. TeGrotenhuis, reporting on an interview with the examiner, stated that the examiner "insists on comparative tests on the use of methylene chloride and one of the freons . . . in a water-free mixture." Even if the submissions of data submitted during the prosecution of the CIP in March of 1961 can be deemed to have been in response to a request made by the examiner during the course of the parent's prosecution, over two and a half years earlier, General's position is not advanced. If General knew or should have known that the requested data would, by itself, be misleading, it had a duty to present sufficient additional data to permit the examiner to view the requested data in an accurate perspective.

39. During the prosecution of the CIP, General gave the examiner conflicting information on isopropyl ether. The specification indicates that "lower molecular weight di-

art agent, isopropyl ether, would under some conditions function as a blowing agent in foams made from both polyesters and polyethers might have persuaded the examiner that polyester and polyether systems are sufficiently analogous so that a blowing agent for one system would be obvious to use in the other system. A rejection by the examiner would have been proper, however, only upon the further finding that it would have been obvious to substitute for the isopropyl ether of Wingfoot the ultimately claimed agents of applicant. The examiner would certainly have been much more likely to take this final step had he known that not only isopropyl ether, but also all of the other Wingfoot agents as well as the methylene chloride of Hochtlen could function in the polyether system. If the examiner had realized that all of the prior art agents could function under some circumstances in the polyether system, he might have deemed obvious the substitution therefor of the Frost agents.[40]

■ This Court can only conclude that the undisclosed information concerning the operability of methylene chloride and the various Wingfoot agents was relevant to the examiner's patentability determination.

■ Coupling the fact of this nondisclosure with the fact that General knew or should have known that the undisclosed information in its possession could have refuted the arguments it was making to the Patent Office, this Court is warranted in drawing an inference of fraudulent intent. Further, since the evidence on which this Court is relying

comes primarily from uncontested documents, the defendants have carried their burden of adducing clear and convincing proof. Accordingly, General's withholding of this information requires, consistent with Monsanto, a finding that the Frost patent is invalid.

Submit order.

### APPENDIX
### DISTRICT OF DELAWARE

| | |
|---|---|
| The General Tire & Rubber Company v. Reichhold Chemical, Inc. | Civil Action No. 3867 |
| The General Tire & Rubber Company v. Diamond Shamrock Corporation | Civil Action No. 3868 |
| The General Tire & Rubber Company v. The Upjohn Company | Civil Action No. 3866 |
| The General Tire & Rubber Company v. Isocyanate Products, Inc. | Consolidated |
| Isocyanate Products, Inc. and Murphy Body Works, Inc. v. The General Tire & Rubber Company | Civil Action No. 3183 |
| The General Tire & Rubber Company v. Jefferson Chemical Company, Inc. | Civil Action No. 3910 |
| BASF Wyandotte Corporation v. The General Tire & Rubber Company | Civil Action No. 4665 |
| Olin Corporation v. The General Tire & Rubber Company | Civil Action No. 4688 |

### EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| The General Tire & Rubber Company v. Wyandotte Chemicals Corporation | Michigan Civil Action 34666 now Delaware Civil Action No. 3944 |

### WESTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| The General Tire & Rubber Company v. Olin Corporation | Virginia Civil Action No. 70–C–29–A now Delaware Civil Action No. 3945 |

alkyl ethers" (a term embracing isopropyl ether) are among those agents "used in the practice of the present invention." (DX–3 at 7). Isopropyl ether is also included in an example in the specification, the result of its use being "Good cell structure, uniform, slight shrinkage, no discoloration," (DX–3 at 17), and the claims at first explicitly covered the "lower molecular weight dialkyl ethers." (DX–3 at 23 and 24). The Nicholas affidavit, however, showed isopropyl

ether resulting in "shrinkage", (DX–3 at 82), or "extreme shrinkage", (DX–3 at 78 and 84), such as would preclude commercial use.

40. Not having performed a patentability determination, this Court is, of course, not presently in a position to determine whether the substitution would have been obvious to one of ordinary skill in the art.